MATTHEW ABBASI, ESQ.; SBN 215030
**ABBASI LAW CORPORATION**
8889 WEST OLYMPIC BOULEVARD, SUITE 240
BEVERLY HILLS, CALIFORNIA 90211
TELEPHONE: (310) 358-9341
FACSIMILE: (888) 709-5448
E-MAIL: MATTHEW@MALAWGROUP.COM

PROPOSED ATTORNEYS FOR DEBTOR,
REEFTON, LLC

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| IN RE:<br><br>REEFTON, LLC,<br><br>DEBTOR. | **CASE NO.: 2:20-bk-10181-VZ**<br><br>**CHAPTER 11 PROCEEDING**<br><br>**DEBTOR'S OPPOSITION TO REXFORD INDUSTRIAL REALTY, L.P.'S MOTION FOR RELIEF OF STAY UNDER 11 U.S.C. §362 (REAL PROPERTY); DECLARATION OF FAHD SOLIMAN IN SUPPORT OF OPPOSITION**<br><br>**<u>HEARING</u>:**<br><br>**DATE:  February 11, 2020**<br>**TIME:   10:00 a.m.**<br>**PLACE: Courtroom 1368** |

**TO THE COURT, MOVANT, COUNSEL, AND ALL INTERESTED PARTIES:**

Debtor, REEFTON, LLC (the "Debtor"), hereby files the herein Opposition (the "Opposition") to Creditor, REXFORD INDUSTRIAL REALTY, L.P.'s (the "Movant") Motion For Relief of Stay Under 11 U.S.C. §362 (the "Motion"). This Opposition to the Motion is based upon the following Memorandum of Points and Authorities; supporting Declaration of Fahd Soliman and attached documents; the records and files in this action; and any further evidence or argument that the Court may properly receive at or before the hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION AND SUMMARY OF FACTS

The Debtor, REEFTON, LLC (hereinafter the "Debtor"), filed for Chapter 11 bankruptcy on January 8, 2020. As set forth below, the Movant's Motion is based on following incorrect facts/assertions:

1.     For instance, contrary to the Movant's Motion, the Debtor's lease with the Movant has not "*matured, been rejected, or deemed rejected by operation of law.*" In fact, the Debtor has a long term lease for three (3) warehouse located at 18310, 18314 Unit 5, and 18316 Oxnard Street, Tarzana, CA 91356 (hereinafter the "Leased Units"). This lease expires on **November 30, 2023**. *See Exhibit "1" to the Movant's Motion.* As it stands, the Debtor, has <u>not</u> rejected the lease in its petition.

2.     Additionally, as set forth in the Declaration of Fahd Soliman, the Movant's UD case was filed based on a defective 5-day Notice which lists the back-owed rent to be **$45,355.95**. However, this figure is incorrect because the Debtor paid the Movant rent before the UD case was filed on **August 6, 2019**. Specifically, the Debtor made payment for a sum of **$33,377.45** online on May 31, 2019 (confirmation Number 600248692). *See Exhibit "A" to the Declaration of Fahd Soliman.* At first, the payment was accepted but it was later rejected and disputes arose about late fees and costs for the Movant's delays in the processing of the payment. Overall, the aforementioned payment disputes were caused by the Movant's own online payment system and poor accounting facilities. Therefore, the Debtor has refused to pay any late fees and penalties. Based on the above, the Debtor maintains that the 5-day Notice served on the Debtor is defective and states the incorrect alleged loan delinquency.

3.     Additionally, as set forth in the Declaration of Fahd Soliman, the Debtor asserts that the Movant breached the lease before the above rental payment dispute arose because the Movant failed to maintain the Leased Units and the common areas. Specifically, the Movant failed to maintain the electrical system and wiring and allowed another tenant to operate an illegal

cannabis cultivation center in the units adjoining the Debtor's Leased Units. Therefore, the Movant failed to properly maintain the Leased Units which led to the fire which destroyed one of the Leased Units. As such, the Movant was responsible for the electrical wiring and systems at the Leased Units and its failure. Based on the above, the Debtor filed lawsuit against the Movant and other tenant(s) for the fire and the damaged caused by the fire. The case is entitled <u>Reefton et. al v. Rexford Industrial Realty, LP, et. al</u>. (LASC Case No. 19VECV01562).

4.      Additionally, the Movant fails to mention that the Debtor has paid the Movant $10,000 in November 2019 and $10,000 in December 2019 for the warehouses located at 18310, and 18314 Unit 5. As explained in the Declaration of Fahd Soliman, the Warehouse located at 18316 was destroyed in a fire and turned over to the Movant since the fire for repairs but the Movant has never returned possession of this warehouse to the Debtor.

5.      Finally, as set forth in the Declaration of Fahd Soliman, the Movant has filed its Motion immediately after the Debtor filed the present case despite the fact the Debtor has offered to pay reasonable adequate protection payments. Instead, the Movant has demanded the payment of $10,000 for one (1) of the warehouses instead of the initial three (3) warehouses which was unworkable for the Debtor considering that the Debtor needs at least two (2) of the warehouses for its business. Therefore, the Movant has in effect refused to accept any adequate protection payments within 30 days of filing under 11 USC 362 (I) (2).

In sum, in the pending Motion, the Movant conveniently fails to mention the payment disputes, the recent payments, or the **August 11, 2019** fire that gutted one (1) of the warehouses. The Movant also fails to mention that by all accounts the fire was caused by the acts/omissions of the Movant.  Therefore, the Movant does not clean hands and has failed to mention extremely relevant facts which totally undercut its arguments.

As it stands, the fire is being investigated by the LAFD. It should also be mentioned that the LAFD discovered the illegal cannabis cultivation center next to the Debtor's Leased Unit after the LAFD knocked down the walls to access the adjoining warehouse during the fire. The discovery of the illegal drug lab at the warehouse caused the fire department personnel to put on

hazardous materials suits as a precaution amongst other things. Thankfully, no one was hurt and the fire was contained to just one of the Debtor's Leased Units because of the sprinkler system. However, the fire caused extensive damage to the Debtor's business because of the loss of use of this warehouse, loss of its equipment, and the loss of the Debtor's inventory/products. *See Exhibit "B" to the Declaration of Fahd Soliman*. Overall, the Debtor has lost over **$112,873.51** because of this fire which is nearly $67,517.55 more than the so-called back owed rent of $45,355.95 which is in dispute as noted above.

In conclusion, the Debtor's business has been severally damaged because of the fire, loss of equipment, loss of inventory, and loss of supplies. However, the Debtor needs the Leased Units to operate its business and has a pending state court case against the Movant and others. Moreover, the Debtor has viable insurance claims to possibly recover some or all of its losses. Overall, contrary to the Movant's assertion in the Motion, the Debtor has equity (positive value) in the lease for the Leased Units which are supremely important to the Debtor reorganization plan. Therefore, the Debtor respectfully request for the court to deny the Movant's Motion and to allow this matter to be converted into a Chapter 11 case so that the Debtor can effectuate a reorganization.

## II.

## <u>LEGAL DISCUSSION</u>

### *A. THE MOVANT IS NOT ENTITLED TO RELIEF FROM STAY UNDER BOTH § 362(D)(1) AND (2).*

Bankruptcy Code § 362(d) provides in pertinent part:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--

(1)for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2)with respect to a stay of an act against property under subsection (a) of this section, if--

(A)the debtor does not have an equity in such property; and

(B)such property is not necessary to an effective reorganization.

In allocating the burdens of proof in relief from stay litigation, § 362(g) provides in pertinent part: In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section-

(1)the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

(2)the party opposing such relief has the burden of proof on all other issues.

*See* also, *Alliance Capital Management L.P. v. County of Orange ( In re County of Orange),* 189 B.R. 499 (Bankr. C.D. Cal. 1995).

In the present case, the Movant erroneously argues that it is entitled to relief from stay under both § 362(d)(1) and (2). As set forth herein above, the Movant's legal position is premised on a flawed UD case. Moreover, as detailed in the Declaration of Fahd Soliman, the Debtor has lost over **$112,873.51** because of the fire which is nearly $67,517.55 more than the so-called disputed back owed rent of $45,355.95. Therefore, the Debtor has "equity" in the lease for the Leased Units. In addition, as set forth above, the Debtor needs the lease for the Leased Units to conduct business and for its reorganization Plan.

It is well settled in the Ninth Circuit that if the debtor can establish that under one interpretation of value that the property has equity, the court is justified in denying relief from the automatic stay. *In re Bialac,* 712 F.2d 426 (9th Cir. 1983). In *Bialac,* the Ninth Circuit asserted that the burden of proof on the question of a debtor's lack of equity in property lies with the creditor. 11 U.S.C. §362(g)(1). *In re San Clemente Estates,* 5 B.R. 605, 610 (Bkrtcy.S.D. Cal.1980); *Matter of Vincent,* 7 B.R. 866 (Bkrtcy.M.D.Fla.1980). Lifting of a section 362 stay requires satisfaction of a two-part test and, failing one part, there is no need to consider the other. Id. at 432-33.

In this case, based on the above, the Debtor maintains that the Movant has failed to show that the Debtor lacks equity in the lease (property). Therefore, there is no need to go further to the second part of the test. However, even if the court needs to go to the second part of the test under § 362(d) (2), the Movant still cannot prevail because the lease for the Leased Units is "necessary

to an effective reorganization." As it stands, the Debtor need only show that there is a reasonable probability that it will be able to propose a plan that will result in a successful reorganization. In this instance, the Debtor has affirmative and valuable claims against the Movant and/or its insurers for the damages that far exceed the alleged unpaid rents. Therefore, the Debtor's Plan is reasonable, probable, and devised in good faith.

Accordingly, the Movant has not met its burden to demonstrate that relief is warranted under either § 362(d)(1) or (2) and as such, the Relief Motion should be denied in its entirety.

## B. THE AUTOMATIC STAY SHOULD NOT BE LIFTED BECAUSE THE MOVANT HAS NO CAUSE FOR THE RELIEF REQUESTED.

The automatic stay is intended to give "the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions" *S. REP. No. 989,95TH CONG., 2D SESS. 54, reprinted in 1978 U.S. CODE CONG. & ADMIN. NEWS 5787, 5840*. The moving party in a motion for relief from stay bears the burden to show a prima facie case that "cause" exists for relief under Bankruptcy Code section 362(d)(1). *See, e.g., In re Plumberex Specialty Products, Inc., 311 B.R. 551, 557 (Bankr. C.D. Calif. 2004)*.

A creditor seeking relief from the automatic stay has the initial burden of producing evidence sufficient to establish a prima facie case that "cause" exists for relief under § 362(d)(1). *Truebro, Inc. v. Plumberex Specialty Prods., Inc. (In re Plumberex Specialty Prods., Inc.), 311 B.R. 551, 557 (Bankr. D. Cal. 2004)* (citations omitted). Cause for lifting the stay has no clear definition and is determined on a case-by-case basis. *See Christensen v. Tucson Estates. Inc. (In re Tucson Estates. Inc.), 912 F.2d 1162, 1166 (9th Cir. 1990)*. In this instance, the Movant has not met its burden and "cause" does not exist for the Movant's Motion.

As set forth above, the Movant is not entitled to stay relief under 11 U.S.C. § 362(d)(1) and (d) (2). In this instance, there may be no equity in the lease for the Leased Units at issue for purposes of 11 U.S.C. § 362. See *Stewart v. Gurley, 745 F.2d 1194 (9th Cir. 1984)*. However, there is no requirement that equity exist in the lease for an effective reorganization once this case is converted. A debtor bears the burden to establish that the property is necessary to an effective

reorganization. 11 U.S.C. § 362(g)(2).

In this instance, the Debtor has affirmative claims against the Movant and others for the damage caused because of the fire and has a viable state court case for the same. As such, the Debtor should be able to recover sufficient funds to restart its operations. Therefore, the Debtor needs the lease for the Leased Units for its reorganization Plan. While the LAFD's investigation is ongoing, all indications are that the fire was caused by due to an electrical system problem of some sort which could have been caused by the high electrical needs of the illegal drug lab next door. Therefore, the Movant does not have clean hands and is at least partially responsible for the damages inflicted upon the Debtor.

Overall, the purposes of the Bankruptcy Code include facilitating the successful rehabilitation of the debtor, and maximizing the value of the bankruptcy estate. *Sec. Farms v. Gen. Teamsters, Warehousemen & Helpers Union, Local 890 (In re Gen. Teamsters, Warehousemen & Helpers Union, Local 890),* 265 F.3d 869, 877 (9th Cir. 2001) (citation omitted). The debtor in possession performing the duties of the trustee is the representative of the estate and is saddled with the same fiduciary duty as a trustee to maximize the value of the estate available to pay creditors. *Cheng v. K&S Diversified Invs., Inc. (In re Cheng),* 308 B.R. 448, 455 (B.A.P. 9th Cir. 2004).

Based on the above, the Debtor maintains that there is no "cause" to support the Movant's Motion. Accordingly, the Movant has not met its burden to demonstrate that relief is warranted under either § 362(d)(1) or (2) and as such, the Relief Motion should be denied in its entirety.

## C.  DEBTOR'S LEASE FOR THE LEASED UNITED WAS NOT TERMINATED AND IS AN ASSET OF THE ESTATE.

As noted before, contrary to the Movant's Motion, the Debtor's lease with the Movant has not "*matured, been rejected, or deemed rejected by operation of law.*" In fact, the Debtor has a long term lease for the Leased Units which expires on **November 30, 2023**. *See Exhibit "1" to the Movant's Motion.* As it stands, the Debtor, has <u>not</u> rejected the lease in its petition and the Movant has offered to pay adequate protection payments within 30 days of the filing of this case.

California's general statutory declaration of the right to relief from forfeiture (*Civil Code* § 3275) is supplemented by *Code of Civil Procedure* Sec. 1179, establishing a special proceeding for the relief of a defaulting tenant. This right of relief from forfeitures can be obtained even after a judgment against the tenant has been entered in a state court unlawful detainer action.

*In Re Windmill Farms. Inc.* 841 F. 2d 1467 (9th Cir. 1988) held that assumability of a lease by a trustee in bankruptcy, in the context of a lease termination claim, involves a two-part test. The first part of the test is to determine whether the lease terminated before the petition in bankruptcy was filed. The second part request the court to "determine whether the termination could have been reversed under a state anti-forfeiture provision or other applicable state law." The second step in the analysis "permits the [trustee] the same opportunities to avoid forfeiture of a lease... that it would have received under state law absent the bankruptcy proceedings." (p. 1472.)

The Court may relieve a tenant against a forfeiture of a lease or rental agreement, whether written or oral, and whether or not the tenancy has terminated, and restore him or her to his or her former estate or tenancy, in case of hardship, as provided in Section 1174. The court has the discretion to relieve any person against forfeiture on its own motion. Moreover, *Code of Civil Procedure* Sec. 1179 gives the court the authority to relieve a defendant of burdens of the judgment in an unlawful detainer action. It provides the court with broad equitable discretion to determine the conditions upon which relief will be granted to the end that exact justice may be done. *Gill Petroleum, Inc. v. Haver* (3rd Dist., 2006) 137 C.A. 4th 826, 828.

*In Gill Petroleum. Inc. v. Haver* the commercial landlord filed the unlawful detainer action against the tenants for failure to pay for permits for underground storage tanks. The tenants disputed that they were obligated to pay for the permits contending that under the State law the owner of the property on which tenants' gas station and market were located had the obligation to pay the permit fees for the underground storage tanks. After landlord obtained a judgment declaring a forfeiture of the lease and awarding the landlord per diem damages of fair rental valued of the time tenants were in the premises after the expiration of the three day notice to pay rent or vacate, the Superior Court granted tenants' petition for relief from forfeiture. The landlord appealed

1  but the Appellate Court held that the trial court had jurisdiction to reconsider and modify per diem

2  damages to lesser amount of rent specified in lease.

3      Under section 1179, the court in balancing the equities should take into consideration the

4  circumstances of the case, the hardship, if any, to the lessee from the forfeiture, the hardship, if

5  any, to the lessor from relieving the lessee from the forfeiture, the willful or other character of the

6  breach, and then use its best discretion in determining whether relief will be granted. *Hitmell v.*

7  *Gebala* (1st Dist., Div. 1 1949) 90 C.A. 2d 61, 70 - 71. In this instance, a balancing of the hardships

8  should be in favor of the Debtor because of the damage inflicted on the Debtor because of the fire

9  and the cause of the fire in the first place.

10      Accordingly, based on the above, the Debtor asserts that the automatic stay applies to the

11  lease for the Leased Units because this lease is estate property which is very important to the

12  Debtor's reorganization plan and business. Therefore, the Movant's UD Case must be stayed.

13  Further, Movant's Motion has not met its burden to demonstrate that relief is warranted under

14  either § 362(d)(1) or (2) and as such, the Relief Motion should be denied in its entirety.

15

16  DATED:  January 28, 2020                    **ABBASI LAW CORPORATION**

17                                             */S/MATTHEW ABBASI*

18                                  By:  _____

19                                             MATTHEW ABBASI, ESQ.
                                             PROPOSED ATTORNEYS FOR
                                             DEBTOR, REEFTON, LLC

20

21

22

23

24

25

26

27

28

-9-

**DEBTOR'S OPPOSITION TO REXFORD INDUSTRIAL REALTY, L.P.'S MOTION FOR RELIEF OF STAY
UNDER 11 U.S.C. §362 (REAL PROPERTY)**

MATTHEW ABBASI, ESQ.; SBN 215030
**ABBASI LAW CORPORATION**
8889 WEST OLYMPIC BLVD, SUITE 240
BEVERLY HILLS, CALIFORNIA 90211
TEL:(310) 358-9341
E-FAX: (888) 709-5448
EMAIL: MATTHEW@MALAWGROUP.COM

PROPOSED ATTORNEYS FOR, DEBTOR,
REEFTON, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| IN RE: | **CASE NO.: 2:20-bk-10181-VZ** |
| | **CHAPTER 11 PROCEEDING** |
| REEFTON, LLC | **DECLARATION OF FAHD SOLIMAN IN SUPPORT OF OPPOSITION TO REDFORD INDUSTRIAL REALTY, L.P.'S MOTION FOR RELIEF OF STAY UNDER 11 U.S.C. §362 (I)** |
| DEBTOR. | |

I, **FAHD SOLIMAN**, declare:

I am over the age of eighteen (18) years old, and if called upon to testify I could and would do so competently. I have personal knowledge of the facts set forth herein, and based on that personal knowledge, I assert the following facts as true and correct to the best of my knowledge:

1.    I am the Managing Member of the Debtor, Reefton, LLC (hereinafter the "Debtor"). I personally authorized the Debtor to file the Debtor's Chapter 11 case on **January 8, 2020**.

---

2.      The Debtor has a long term lease for three (3) warehouse located at 18310, 18314 Unit 5, and 18316 Oxnard Street, Tarzana, CA 91356 (hereinafter the "Leased Units"). However, our unit located at 18316 was destroyed in a fire due to negligent acts/omissions of REDFORD INDUSTRIAL REALTY, L.P. (the "Movant").

3.      The Debtor was forced to file for bankruptcy to stop a wrongful Unlawful Detainer judgment which falsely claimed that we had not paid rent for 90 days before the UD case was filed on August 6, 2019. However, before the Movant filed its UD Case, the Debtor made payment for a sum of $33,377.45 with confirmation Number 600248692 on May 31, 2019. At first, the payment was accepted but they were later on rejected and disputes arose about late fees and costs for delays in the process of payment. Overall, all these issues arose due to payment issues with Movant's own payment system. In the end, a false delinquency was created to justify a UD case against the Debtor. Thereafter, a few days after the UD case was served, the warehouse with the address of 18316 Oxnard Street, Tarzana, CA 91356 caught on fire.  Attached hereto as **Exhibit "A"** is a true and correct copy of the email confirmation for the $33,377.45 payment with confirmation Number 600248692 on May 31, 2019

4.      Despite the above, the Movant was able to obtain an UD Judgment against the Debtor because our former counsel failed to adequately represent us. As such, after the entry of the judgment we agreed to pay the landlord monthly payments of $10,000 per month for November and December 2019. Thereafter, we offered to make the same payment for January 2020 and for the next few months until we could find a new location or to reorganize our business in light of the significant damage to our business due to the fire. However, the Movant refused and demanded the payment of $10,000 for one (1) of the warehouses instead of the initial three (3) warehouses which was unworkable for us considering that we need these warehouses for our business. Therefore, the Movant has refused to accept any adequate protection payments and filed the herein Motion to evict us from the Leased Units. I am going to look into paying the clerk the rental sums to protect us from eviction. The Debtor has assets, has income, and has an ability to pay adequate protection payments.

5.      As it stands, the cause of the fire is still being investigated by the Los Angeles Fire

**DECLARATION OF FAHD SOLIMAN IN SUPPORT OF OPPOSITION TO REDFORD INDUSTRIAL REALTY, L.P.'S MOTION FOR RELIEF OF STAY UNDER 11 U.S.C. §362 (I)**

Department (LAFD). However, from all accounts it seems that the fire at our unit was caused by faulty electrical wiring or related components which were supposed to be maintained by the Movant. Moreover, it seems that the fire may also have been caused or aggravated by the tenant of the adjoining warehouse whom was using this space to illegally cultivate cannabis and to store hazardous/flammable materials. The above was discovered by the LAFD when they had to access the adjoining warehouse during the fire. The discovery of the illegal drug lab at the warehouse caused the fire department personnel to put on hazardous materials suits as a precaution amongst other things. Thankfully, no one was hurt and the fire was contained to just our unit because of the sprinkler system but our business has been greatly damaged because of the loss of use of this warehouse, loss of our equipment, and the loss of our inventory/products.

6.      Attached hereto as **Exhibit "B"** is a true and correct listing of all property which were either lost in the fire, had water damage, and/or smoke damage. Due to the integrity of the medical supply industry, damaged items cannot be used or sold. Therefore, as detailed in this exhibit, we have lost over **$112,873.51** in this fire which is nearly $67,517.55 more than the so-called back owed rent of $45,355.95 (as stated in the UD Case).

7.      As set forth the above, the Movant was responsible for the electrical wiring and systems at the Leased Units and not the Debtor. Further, the Movant knew or should have known that the tenant next to us was using the adjoining unit to conduct an illegal and dangerous business. Therefore, the Debtor filed lawsuit against its landlord and other tenant(s) for the fire that occurred at its leased commercial warehouses. The case is entitled Reefton et. al v. Rexford Industrial Realty, LP, et. al. (LASC Case No. 19VECV01562). Attached hereto as **Exhibit "C"** are true and correct copy of pictures depicting fire damage to the affected unit and property therein. Attached hereto as **Exhibit "D"** is a true and correct copy of the above-cited lawsuit.

8.      As it stands, the Debtor's business has been severally damaged because of the fire, loss of equipment, inventory, and supplies. However, the Debtor also has viable causes of action against the Movant and others. Moreover, the Debtor may have a viable insurance claim to recover its losses. Finally, the Leased Units are supremely important to the Debtor reorganization plan. Therefore, please deny the Movant's Motion so that the Debtor can effectuate a reorganization.

1      I declare under penalty of perjury under the laws of the State of California and the United

2  States of America that the foregoing is true and correct to the best of my knowledge. This

3  Declaration was executed this date January 28, 2020, in Los Angeles, California.

4

5                                          _____

6                                          **FAHD SOLIMAN**, Declarant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF FAHD SOLIMAN IN SUPPORT OF OPPOSITION TO REDFORD INDUSTRIAL REALTY, L.P.'S MOTION
FOR RELIEF OF STAY UNDER 11 U.S.C. §362 (I)**

# EXHIBIT "A"

## Matthew Abbasi

| | |
|---|---|
| **From:** | mayra@mew1.net |
| **Sent:** | Thursday, October 3, 2019 3:58 PM |
| **To:** | Matthew Abbasi |
| **Subject:** | [FWD: Payment Confirmation] |

Below is the payment confirmation we got for $33, 375.00.

-------- Original Message --------
Subject: Payment Confirmation
From: "Rexford Industrial" <no-reply@commercialcafes.com>
Date: Fri, May 31, 2019 6:05 pm
To: mayra@mew1.net



## Payment Confirmation

Dear Mayra Mendoza,

This email confirms we have received your one-time online payment. Please review the payment information below and keep this email for your personal records.

**PAYMENT INFORMATION**
Payment confirmation number:
600248692

Payment Account used:
Stronghold Asset Management Chk *****3769

Total Payment Amount:
33,375.50
*Service Fee: 1.95
Total Amount: 33,377.45

*The service fee is collected by the Payment Agent, not the property management company, and will not display on your ledger. Service fee is non-refundable.*

To view additional payment details, please log in to your Tenant Portal account at:

https://tenantportal-rexfordindustrial.securecafe3.com/TenantPortal/CommercialLeasing/UserLogin.aspx?PropertyId=3853&CompanyID=119

Your security is important to us. If you did not authorize this change, please contact your property manager immediately.

# EXHIBIT "B"

| DESCRIPTION | | STD Cost | Selling Price | Rebate Cost | QTY | Total |
|---|---|---|---|---|---|---|
| SUTURE 4-0 ETHILON 18" CLEAR MONO PS-2 | BX=12 | 116.49 | 36.11 | 36.11 | 10 | $361.10 |
| SUTURE 4-0 GUT CHROMIC 18"PS-2 | BX=12 | 188.83 | 71.49 | 71.49 | 18 | $1,286.82 |
| SUTURE 4-0 18in ETHILON BLK MONO SA PS-4, 12/BX | BX=12 | 117.84 | 37.83 | 37.83 | 15 | $567.45 |
| SUTURE 3-0 ETHILON 18" Pliab. BLACK MONO PS-1 | BX=12 | 113.75 | 37.61 | 37.61 | 12 | $451.32 |
| SUTURE 5-0 ETHILON 18" Pliab. BLACK MONO PS-2 | BX=12 | 97.39 | 36.87 | 36.87 | 20 | $737.40 |
| SUTURE 4-0 ETHILON 18" Pliab. BLACK MONO PS-2 | BX=12 | 105.14 | 37.61 | 37.61 | 12 | $451.32 |
| SUTURE 4-0 ETHILON 18" Pliab. BLACK MONO PS-2 | BX=36 | 0 | 112.82 | 112.82 | 9 | $1,015.38 |
| SUTURE 5-0 ETHILON 18" Pliab. BLACK MONO PS-3 | BX=12 | 114.38 | 37.94 | 37.94 | 10 | $379.40 |
| SUTURE 3-0 ETHILON 18" Pliab. BLACK MONO PS-2 | BX=36 | 313.25 | 116.63 | 116.63 | 18 | $2,099.34 |
| SUTURE 4-0 ETHILON 18" Pliab. BLACK MONO P-3 | BX=12 | 97.84 | 37.05 | 37.05 | 12 | $444.60 |
| SUTURE 0 30in PROLENE BLU MONO SA CT-2, 36/BX | BX=36 | 227.24 | 74.91 | 74.91 | 20 | $1,498.20 |
| SUTURE 0 PROLENE 30" BLUE MONO CT-1 | BX=36 | 210.03 | 74.32 | 74.32 | 14 | $1,040.48 |
| SUTURE 1 PROLENE 30" BLUE MONO CT-1 | 0 | 217.74 | 75.54 | 75.54 | 15 | $1,133.10 |
| SUTURE 5-0 18in PROLENE BLU MONO SA PC-1, 12/BX | BX=12 | 183.49 | 54.05 | 54.05 | 9 | $486.45 |
| SUTURE 3-0 30in PROLENE BLU MONO SA KS, 36/BX | BX=36 | 287.96 | 79.47 | 79.47 | 8 | $635.76 |
| SUTURE 2-0 PROLENE 30" BLUE MONO KS | BX=36 | 181.38 | 79.47 | 79.47 | 22 | $1,748.34 |
| SUTURE 5-0 18in PROLENE BLU MONO SA PC-3, 12/BX | BX=12 | 183.49 | 54.05 | 54.05 | 20 | $1,081.00 |
| SUTURE 5-0 PROLENE 18" BLUE MONO FS-2 | BX=12 | 68.07 | 28.39 | 28.39 | 12 | $340.68 |
| SUTURE 3-0 PROLENE 18" BLUE MONO PS-1 | BX=12 | 137.41 | 45.44 | 45.44 | 5 | $227.20 |
| SUTURE 3-0 PROLENE 18" BLUE MONO FS-2 | BX=12 | 0 | 28.94 | 28.94 | 16 | $463.04 |
| SUTURE 5-0 PROLENE 18" BLUE MONO PS-3 | BX=12 | 0 | 49.78 | 49.78 | 25 | $1,244.50 |
| SUTURE 4-0 PROLENE 18" BLUE MONO PS-2 | BX=12 | 128.55 | 47.07 | 47.07 | 8 | $376.56 |
| SUTURE 4-0 PROLENE 18" BLUE MONO FS-2 | BX=12 | 74.07 | 27.97 | 27.97 | 16 | $447.52 |
| SUTURE 3-0 PROLENE 18" BLUE MONO FS-1 | BX=12 | 74.28 | 26.28 | 26.28 | 3 | $78.84 |
| SUTURE 5-0 PROLENE 18" BLUE MONO PS-2 | BX=12 | 121.39 | 45.96 | 45.96 | 20 | $919.20 |
| SUTURE 3-0 PROLENE 18" BLUE MONO PS-2 | BX=36 | 385.26 | 136.32 | 136.32 | 18 | $2,453.76 |
| SUTURE 6-0 PROLENE 18" BLUE MONO P-3 | BX=12 | 142.11 | 50.29 | 50.29 | 17 | $854.93 |
| SUTURE 7-0 PROLENE 18" BLUE MONO P-1 | BX=12 | 137.96 | 52.46 | 52.46 | 14 | $734.44 |
| SUTURE 6-0 PROLENE 18" BLUE MONO P-1 | BX=12 | 141.17 | 49.95 | 49.95 | 6 | $299.70 |
| SUTURE 5-0 PROLENE 18" BLUE MONO P-3 | BX=12 | 130.89 | 49.55 | 49.55 | 18 | $891.90 |
| SUTURE 4-0 PROLENE 18" BLUE MONO P-3 | BX=12 | 131.76 | 46.61 | 46.61 | 13 | $605.93 |
| SUTURE 6-0 PROLENE 30" BLUE MONO RB-2,RB-2 | BX=36 | 519.29 | 160.09 | 160.09 | 5 | $800.45 |
| SUTURE 5-0 MONOCRYL 18" UNDYED MONO P-3 | BX=12 | 144.8 | 51.23 | 51.23 | 21 | $1,075.83 |
| SUTURE 4-0 MONOCRYL 18" UNDYED MONO P-3 | BX=12 | 154.94 | 51.23 | 51.23 | 13 | $665.99 |
| SUTURE 5-0 MONOCRYL 18" UNDYED MONO PS-2 | BX=12 | 161.5 | 51.23 | 51.23 | 10 | $512.30 |
| SUTURE 4-0 MONOCRYL 18" UNDYED MONO PS-2 | BX=12 | 150.99 | 51.23 | 51.23 | 16 | $819.68 |
| SUTURE 3-0 MONOCRYL 18" UNDYED MONO PS-2 | BX=12 | 149.38 | 51.23 | 51.23 | 22 | $1,127.06 |
| SUTURE 5-0 MONOCRYL 18" UNDYED MONO PC-1 | BX=12 | 133.81 | 56.13 | 56.13 | 8 | $449.04 |
| SUTURE 2-0 36in MONOCRYL UND MONO SA CT-1 36/B | BX=36 | 212.16 | 69.95 | 69.95 | 11 | $769.45 |
| SUTURE 5-0 PDS II 18" CLEAR MONO P-3 | BX=12 | 162.47 | 49.9 | 49.9 | 22 | $1,097.80 |
| SUTURE 4-0 PDS II 18" CLEAR MONO PS-2 | BX=12 | 131.8 | 49.9 | 49.9 | 18 | $898.20 |
| SUTURE 3-0 PDS II 18" CLEAR MONO PS-2 | BX=12 | 101.35 | 46.14 | 46.14 | 19 | $876.66 |
| CONTAINER, SHARP 5.4QT CLEAR | CS=20 E | 5.38 | 2.4 | 2.4 | 20 | $48.00 |
| CONTAINER, SHARPS RED 19GL (5/CS) | CS=5 EA | 19.25 | 16.08 | 16.08 | 20 | $321.60 |
| CAPE EXAM 30"X21"TPT MAUVE 100/CS | CS=100 | 22.58 | 17.3 | 17.3 | 7 | $121.10 |
| CAPE EXAM 30x21 ETPT 100/CS PEACH | CS=100 | 21.95 | 14.74 | 14.74 | 15 | $221.10 |

| Description | | | | | | |
|---|---|---|---|---|---|---|
| GOWN EXAM 30" X 42" TPT MAUVE 50/CS | 0 | 17.7 | 14.74 | 14.74 | 17 | $250.58 |
| TABLE PAPER SMOOTH 21" X 225' | CS=12 | 29.95 | 23.93 | 23.93 | 13 | $311.09 |
| DRAPE, SHEET 40" X 72" 3-PLY, WHITE, N/S | CS=1 | 16.87 | 13.57 | 13.57 | 8 | $108.56 |
| SHEET, STRETCHER, BLUE, 40" X 90" | CS=50 | 26.19 | 25.19 | 25.19 | 25 | $629.75 |
| SHEET, HEADREST W/SLIT 12" X12" WHITE, SMOOTH 10 | CS=100( | 15.37 | 12.25 | 12.25 | 16 | $196.00 |
| SHEET BED TISSUE W/POLY BCK 60X96 25/CS | CS=25 | 16.21 | 15.19 | 15.19 | 12 | $182.28 |
| SODA SORB, CO2 ABSORBENT, PRE-PAK CANNISTER DIS | CS=12 E | 10.42 | 7.67 | 7.67 | 17 | $130.39 |
| BASIC PACK, V (8/CS) | CS=8 EA | 14.09 | 8.9 | 8.9 | 9 | $80.10 |
| DRAPE, LAP W/TROUGHS 100W X 72W X124L 13/CS | 0 | 134.82 | 104.39 | 104.39 | 13 | $1,357.07 |
| GOWN,SURG ULTRA STD BLU LG 32/CS | 0 | 122.1 | 83.29 | 83.29 | 3 | $249.87 |
| NEEDLE EPIDURAL TOUHY 17G X 6" 25/cs | CS=25 | 0 | 229.22 | 229.22 | 18 | $4,125.96 |
| NEEDLE, SPINAL, QUINCKE 25G X 2-1/2" STERILE | CS=25 | 117.08 | 97.38 | 97.38 | 10 | $973.80 |
| MASK, TIE ON, SOFT TOUCH II BLUE | CS=6 BX | 9.58 | 4.96 | 4.96 | 21 | $104.16 |
| BOOT, FULL COVERAGE, XL, REGULAR | CS=3 BX | 51.21 | 23.22 | 23.22 | 7 | $162.54 |
| CIDEX OPA SOLUTION GALLON | CS=4 EA | 37.37 | 21.45 | 21.45 | 11 | $235.95 |
| WRAP, STRLZ 24" X 24" 1-STEP, BLUE 120/PK 2PK/CS=24 | CS=240 | 33.88 | 27.72 | 27.72 | 10 | $277.20 |
| TOWEL, PAPER MULTI FOLD WHITE | CS=16 P | 2.02 | 1.08 | 1.08 | 30 | $32.40 |
| TISSUES, KLEENEX, WHITE 100/BX | CS=36 | 27.82 | 21.5 | 21.5 | 22 | $473.00 |
| SHOE COVER, BOOT FULL NON-SKID | CS=3 BX | 44 | 56.13 | 56.13 | 15 | $841.95 |
| GLOVE, EXAM, NITRILE, SMALL, LAVENDER, P/F, N/S, 25 | CS=10 B | 12.5 | 10.38 | 10.38 | 13 | $134.94 |
| GLOVE, EXAM, NITRILE, PURPLE, MEDIUM, P/F, N/S, TEX | CS=10 B | 7.9 | 5.24 | 5.24 | 10 | $52.40 |
| MASK, SURG FOG FREE GREEN 6/CS | CS=6 BX | 11.53 | 11.11 | 11.11 | 24 | $266.64 |
| MASK, CLASSIC, TIE-ON, BLUE | 0 | 6.3 | 3.73 | 3.73 | 22 | $82.06 |
| BASIC PACK VI | 0 | 94.5 | 62.16 | 62.16 | 18 | $1,118.88 |
| LITHOTOMY DRAPE PACK II Sterile | 10/CS | 65 | 46.4 | 46.4 | 16 | $742.40 |
| SODIUM CHLORIDE INH 0.45% 1000ML *CAREFUSION R | CS=12 | 31.91 | 21.37 | 21.37 | 2 | $42.74 |
| MASK, OXYGEN, ADULT W/ 7FT.TUBING *CAREFUSION I | CS=50 E | 0.7 | 0.57 | 0.57 | 7 | $3.99 |
| NEBULIZER, MISTY W/T&TUBE *CAREFUSION RESPIRAT( | CS=50 E | 0.81 | 0.65 | 0.65 | 15 | $9.75 |
| CHLORAPREP 5.25ml APPL. FOAM SWABSTICK 40/CS | CS=40 | 40.13 | 320 | 320 | 19 | $6,080.00 |
| APPLICATOR, CHLORAPREP 3ML ONE-STEP 25/CTN *CAI | CS=4 EA | 31.25 | 23 | 23 | 3 | $69.00 |
| CHLORAPREP 10.5ML APPLICATOR 2% CHLORHEXIDINE | BX=25 E | 4.32 | 91.38 | 91.38 | 12 | $1,096.56 |
| APPLICATOR, CHLORAPREP 10.5ML WITH HI-LITE ORAN( | CS=4 PK | 115 | 99.44 | 99.44 | 19 | $1,889.36 |
| CLORAPREP26ML APPLICATOR W/HI-LIT | CS=25 E | 10.56 | 7.26 | 7.26 | 13 | $94.38 |
| SYRINGE, INSULIN, 1CC 31G X 5/16" 100/BX | CS=5 BX | 24.37 | 18 | 18 | 8 | $144.00 |
| SYRINGE, INSULIN 3/10ML 31G X 5/16" LO-DOSE 100/B) | CS=5 BX | 24.37 | 17.44 | 17.44 | 2 | $34.88 |
| SYRINGE, INSULIN, 1/2CC 31G X 5/16" 100/BX | CS=5 BX | 24.37 | 17.44 | 17.44 | 8 | $139.52 |
| SYRINGE 20CC LUER LOCK TIP | CS=4 BX | 11.8 | 8.64 | 8.64 | 15 | $129.60 |
| SYRINGE 30CC LUER-LOK TIP | CS=4 BX | 15.74 | 11.2 | 11.2 | 16 | $179.20 |
| SYRINGE, CATH TIP 2 OZ , 60CC, 40/BX 4/CS | CS=4 BX | 29.91 | 12.52 | 12.52 | 22 | $275.44 |
| SYRINGE 5CC LUER LOCK TIP 125/BX | CS=4 BX | 11.34 | 7.5 | 7.5 | 14 | $105.00 |
| SYRINGE 60CC LUER LOCK | CS=4 BX | 16.78 | 12.52 | 12.52 | 8 | $100.16 |
| SYRINGE, 60CC LUER SLIP | CS=4 BX | 33.95 | 12.08 | 12.08 | 11 | $132.88 |
| SYRINGE 3CC LUER LOCK 200/BX | CS=4 BX | 11.6 | 6.98 | 6.98 | 7 | $48.86 |
| SYRINGE 1CC LUER LOCK 100/BX | CS=8 BX | 31.36 | 24 | 24 | 20 | $480.00 |
| SYRINGE 10CC CONTROL LUER LOCK | CS=4 BX | 23.71 | 16 | 16 | 14 | $224.00 |
| GLOVE, EXAM, NITRAFREE, LARGE, PINK, L/F, P/F, N/S, T | CS=10 B | 6.99 | 5.8 | 5.8 | 10 | $58.00 |
| GLOVE, SURGICAL, LATEX SIZE 8 POWDER, STERILE | CS=4 BX | 19.91 | 15.25 | 15.25 | 25 | $381.25 |

| Description | Unit | | | | | |
|---|---|---|---|---|---|---|
| GLOVE SURGICAL LATEX SZ 8.5 PF | CS=4 BX | 19.48 | 15.5 | 15.5 | 12 | $186.00 |
| GLOVE, EXAM, NITRAFREE, LARGE, PINK, L/F, P/F, N/S, T | CS=10 B | 6.99 | 5.8 | 5.8 | 6 | $34.80 |
| GLOVE SURGICAL SMOOTH PF 6.5 | CS=4 BX | 87.5 | 61.75 | 61.75 | 13 | $802.75 |
| GLOVE SURGICAL SMOOTH PF 7 | 0 | 87.5 | 61.75 | 61.75 | 23 | $1,420.25 |
| GLOVE SURGICAL SMOOTH PF 7.5 | CS=4 BX | 87.5 | 61.75 | 61.75 | 17 | $1,049.75 |
| GLOVE SURGICAL SMOOTH PF 8 | 0 | 87.5 | 61.75 | 61.75 | 9 | $555.75 |
| GLOVE, SURGICAL, LATEX 6.5 P/F, STERILE | CS=4 BX | 44.42 | 31 | 31 | 6 | $186.00 |
| GLOVE, SURGICAL, LATEX, SZ 7 P/F, STERILE | CS=4 BX | 39 | 31.25 | 31.25 | 16 | $500.00 |
| GLOVE SURGICAL LATEX SZ 7-1/2 P/F STERILE | CS=4 BX | 32.5 | 31 | 31 | 2 | $62.00 |
| GLOVE, SURGICAL, LATEX SZ 8.5 P/F, STERILE | CS=4 BX | 39 | 31 | 31 | 7 | $217.00 |
| NEEDLE 20G X 1" 100/BX | CS=10 B | 9.09 | 9.09 | 5.38 | 12 | $109.08 |
| NEEDLE 25G X 5/8" 100/BX | CS=10 B | 6.88 | 6.88 | 5.38 | 17 | $116.96 |
| SYRINGE 1CC TB 25G X 5/8" 100/BX | CS=100 | 75.55 | 75.55 | 62.32 | 20 | $1,511.00 |
| DRESSING, TELFA 2" X 3" NON-ADHESIVE, STERILE 100/E | CS=24 B | 8.31 | 8.31 | 6.84 | 2 | $16.62 |
| MAGNETIC DRAPE 10" X 16" | CS=3 EA | 162.61 | 162.61 | 81.49 | 18 | $2,926.98 |
| NEEDLE COUNTER, DOUBLE MAGNETIC 30/30 (1530) | CS=8 BX | 15.39 | 15.39 | 10.41 | 23 | $353.97 |
| CONTAINER, SHARP 2 GALLON, RED | CS=20 E | 2.6 | 2.6 | 1.98 | 4 | $10.40 |
| NEEDLE COUNTER, SINGLE MAGNETIC 10/10 (1100) | CS=8 BX | 16.65 | 16.65 | 9.38 | 19 | $316.35 |
| MARKER, SURGICAL, REGULAR TIP WITH FLEXIBLE RULE | CS=4 BX | 21.26 | 21.26 | 12.71 | 15 | $318.90 |
| MARKER, SURGICAL, REGULAR TIP WITH FLEXIBLE RULE | CS=4 BX | 18.25 | 18.25 | 10.91 | 8 | $146.00 |
| MARKER SURGICAL WITH RULER CAP REGULAR TIP STEF | CS=4 BX | 28.44 | 28.44 | 15.53 | 10 | $284.40 |
| PADDING, UNDERCAST 4" X 4YDS N/S, REGULAR FINISH, | CS=6 BG | 11.79 | 11.79 | 10.83 | 17 | $200.43 |
| PADDING UNDERCAST 6" X 4YD N/S | CS=6 BG | 8.35 | 8.35 | 8 | 19 | $158.65 |
| GAUZE, SPONGE 4" X 4" 12-PLY, STERILE 10/TRAY | CS=128 | 0.57 | 8.35 | 0.51 | 23 | $192.05 |
| SYRINGE 3CC LUER SLIP TIP NOT FOR VET OR DENTAL 1C | BX=100 | 9.22 | 9.22 | 8 | 27 | $248.94 |
| SYRINGE 35CC LUER LOCK | CS=6 BX | 15.56 | 15.56 | 8.4 | 14 | $217.84 |
| SYRINGE MONOJECT 60ML TOOMEY NOSAFE | BX=20 E | 3.4 | 3.4 | 0.96 | 6 | $20.40 |
| DRESSING, GAUZE, XEROFORM 1"X8" STERILE | CS=4 BX | 23 | 23 | 23.75 | 19 | $437.00 |
| PAD, ABDOMINAL 5" X 9" STERILE 36/TRAY | CS=12 P | 6.4 | 6.4 | 5.5 | 2 | $12.80 |
| PAD, ABDOMINAL 8" X 10" STERILE 18/TRAY | CS=12 P | 5.1 | 5.1 | 4.24 | 9 | $45.90 |
| NEEDLE EPIDURAL TOUHY 17G X 5" 25/CS | 0 | 186.38 | 186.38 | 110 | 18 | $3,354.84 |
| NEEDLE, SPINAL, QUINCKE 25G X 2-1/2" STERILE | CS=25 | 117.08 | 117.08 | 116.12 | 21 | $2,458.68 |
| GLOVE AQUASOFT PF NITRILE XS | CS=10 B | 9.1 | 9.1 | 9.1 | 3 | $27.30 |
| GLOVE AQUASOFT PF NITRILE SMALL | CS=10 B | 9.1 | 9.1 | 7.05 | 9 | $81.90 |
| GLOVE AQUASOFT PF NS MED BLUE | BX=300 | 10.04 | 10.4 | 9.1 | 7 | $72.80 |
| GLOVE, AQUASOFT PF NITRILE LARGE | CS=10 B | 9.1 | 9.1 | 7.05 | 11 | $100.10 |
| GOWN SURGICAL LARGE SILVER L4 | CS=32 | 142.19 | 142.19 | 101.61 | 17 | $2,417.23 |
| MASK, PROCEDURE, EARLOOP, BLUE | CS=10 B | 6.15 | 6.15 | 3.5 | 19 | $116.85 |
| MASK, TIE ON, SOFT TOUCH II BLUE | CS=6 BX | 9.58 | 9.58 | 4.96 | 25 | $239.50 |
| MASK, CLASSIC, TIE-ON, BLUE | 0 | 6.3 | 6.3 | 4.44 | 13 | $81.90 |
| MASK, SURGICAL, DUCKBILL, BLUE | CS=6 BX | 7.11 | 7.11 | 4.94 | 8 | $56.88 |
| MASK, FOG-FREE, WRAP AROUND VISOR, TIE-ON, ANTI- | CS=4 BX | 20.3 | 20.3 | 17.86 | 6 | $121.80 |
| MASK, SURGICAL SO SOFT WHITE, TIE-ON, NOSE PIECE, | CS=6 BX | 7.16 | 7.16 | 6.1 | 14 | $100.24 |
| GLOVE, EXAM, NITRILE, SMALL, LAVENDER, P/F, N/S, 25 | CS=10 B | 12.5 | 12.5 | 9.9 | 22 | $275.00 |
| GLOVE, EXAM, NITRILE, MEDIUM, LAVENDER, P/F, N/S 2 | CS=10 B | 12.5 | 12.5 | 9.9 | 19 | $237.50 |
| GLOVE, EXAM, NITRILE, LARGE, LAVENDER, P/F, N/S 25C | CS=10 B | 12.5 | 12.5 | 9.9 | 4 | $50.00 |
| GLOVE, EXAM, NITRILE, PURPLE, SMALL, P/F, N/S, TEXTL | CS=10 B | 7.9 | 7.9 | 5.24 | 17 | $134.30 |

| Description | Unit | | | | | Total |
|---|---|---|---|---|---|---|
| GLOVE, EXAM, NITRILE, PURPLE, MEDIUM, P/F, N/S, TE) | CS=10 B | 7.9 | 7.9 | 5.24 | 2 | $15.80 |
| GLOVE, EXAM, NITRILE, PURPLE, LARGE, P/F, N/S, TEXTL | CS=10 B | 7.9 | 7.9 | 5.24 | 7 | $55.30 |
| BRUSH, ENDOSCOPE 2END (50/BX) | 0 | 255.96 | 255.96 | 175 | 18 | $4,607.28 |
| SNARE, POLY 2.3MMX240CM MED (10/CS) | Snare D | 271.14 | 271.14 | 194.25 | 13 | $3,524.82 |
| WRAP, STRLZ, KIMGUARD 48" X 48" 1-STEP, DARK BLUE | CS=24 | 60.17 | 60.17 | 47.95 | 11 | $661.87 |
| WRAP STRLZ 36" X36" 1-STEP 72/CS KC400 | CS=72 | 95.81 | 95.81 | 76.79 | 6 | $574.86 |
| MASK, EARLOOP BLUE FOG FREE 50/BX 10BX/CS | CS=10 B | 7.24 | 7.24 | 6.52 | 7 | $50.68 |
| GOWN PROCEDURE X-LARGE BLUE | CS=60 P | 21.18 | 21.18 | 20.1 | 16 | $338.88 |
| CAP SURGEON UNIVERSAL BLUE 100/BX | CS=3 BX | 16.35 | 16.35 | 11.44 | 9 | $147.15 |
| SHOE COVER X-LARGE BLUE | CS=3 BX | 16.5 | 16.5 | 9.89 | 4 | $66.00 |
| SHOE COVER, BOOT FULL NON-SKID | CS=3 BX | 44 | 44 | 57.25 | 16 | $704.00 |
| BOOT, FULL COVERAGE, UNIVERSAL, BLUE | CS=4 BX | 43.05 | 43.05 | 19.83 | 25 | $1,076.25 |
| BOOT, FULL COVERAGE, XL, REGULAR | CS=3 BX | 51.21 | 51.21 | 23.8 | 23 | $1,177.83 |
| GOWN, PATIENT, UNIVERSAL, BLUE 100/CS | CS=100 | 86.31 | 86.31 | 69.86 | 4 | $345.24 |
| BASIC PACK, V (8/CS) | CS=8 EA | 14.09 | 14.09 | 8.14 | 6 | $84.54 |
| DRAPE LOWER EXTREMITY 12/CS | 0 | 131.3 | 131.3 | 92.01 | 3 | $393.90 |
| DRAPE SHOULDER ORTHOPEDIC 160X102" | CS=10 E | 27.34 | 27.34 | 14.26 | 14 | $382.76 |
| DRAPE LAP/PELVIS W/FLUID POUCH | CS=10 | 239.09 | 239.09 | 166.73 | 20 | $4,781.80 |
| DRAPE CHEST BREAST STERILE | 0 | 85.93 | 85.93 | 78.57 | 7 | $601.51 |
| DRAPE LAPAROTOMY 100WX72WX124L S | CS=13 E | 9.65 | 9.65 | 5.32 | 6 | $57.90 |
| DRAPE, LAP W/TROUGHS 100W X 72W X124L 13/CS | 0 | 134.82 | 134.82 | 101.1 | 14 | $1,887.48 |
| IMPERVIOUS SPLIT DRAPE 60"X70" W/POUCH 42/CS | CS=42 | 161.28 | 161.28 | 77.7 | 15 | $2,419.20 |
| DRAPE, SPLIT, EENT 76" X 124" STERILE | CS=1 | 114.65 | 114.65 | 81 | 10 | $1,146.50 |
| DRAPE EENT SPLIT 76WX124L STERILE | CS=10 E | 8.14 | 8.14 | 4.9 | 19 | $154.66 |
| DRAPE, ARTHO SHLDR STR 2PC W/POUCH (12/CS) | CS=12 | 320 | 320 | 252.66 | 10 | $3,200.00 |
| DRAPE, UNDER BUTTOCKS W/POUCH 40x44 (65/CS) | 0 | 3.32 | 3.32 | 2.08 | 7 | $23.24 |
| GOWN SURGICAL X-LARGE BLUE | CS=32 E | 3.27 | 3.27 | 2.2 | 3 | $9.81 |
| GOWN,MICROCOOL SURG STR SPECIALTY XLG 26/CS | CS=26 | 150 | 150 | 111.8 | 12 | $1,800.00 |

$112,873.51

# EXHIBIT "C"



| Item: | Cost: |
|-------|-------|
| AC unit | $400.00 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |



| Item: | Cost: |
|-------|-------|
| Battery Charger | 125 |
| Heater | 130 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

| Item: | Cost: |
| --- | --- |
| Camper Shell | 1200 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |



| Item: | Cost: |
| --- | --- |
| Electric Drum Set | 300 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Item: | Cost: |
|---|---|
| Mountain Bike | 4300 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Item: | Cost: |
|---|---|
| Drill Press | 150 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |



| Item: | Cost: |
|---|---|
| Sand Blaster unit | 400 |
| Table | 300 |
| Server Tower | 1200 |
| Server | 3500 |
| backup battery | 1200 |
| AC Cooling unit | 750 |
| SMS text server | 2500 |
| Monitor | 199 |



| Item: | Cost: |
|---|---|
| Crossbow | 325 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |



| Item: | Cost: |
|---|---|
| Compressor motors | 600 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

| Item: | Cost: |
|---|---|
| compressor | 325 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |



| Item: | Cost: |
|-------|-------|
| Impact drill | 750 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |



| Item: | Cost: |
|-------|-------|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |



| Item: | Cost: |
|-------|-------|
| Golf Cart | 3500 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |



| Item: | Cost: |
|-------|-------|
| Flat Screen TV1 | 500 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |



| Item: | Cost: |
|---|---|
| Mig Welder | 500 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |



| Item: | Cost: |
|---|---|
| Miscrowave | 325 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

| Item: | Cost: |
|-------|-------|
| Pallet Jack | 200 |
| Pool Table | 5000 |
| | |
| | |
| | |
| | |
| | |
| | |



| Item: | Cost: |
|-------|-------|
| Compressor Tank | 300 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Item: | Cost: |
|---|---|
| Honda 600R Motorcycle | 5500 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |



| Item: | Cost: |
|---|---|
| Power tools | 3500 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |



| Item: | Cost: |
|---|---|
| Power Tools | 1500 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |



| Item: | Cost: |
|---|---|
| Bike rack | 350 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |



| Item: | Cost: |
|---|---|
| Items | 300 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |



| Item: | Cost: |
|---|---|
| Powder Coat Oven | 800 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Item: | Cost: |
|---|---|
| Electrical Boxes with braided wire | |
| | |
| | |
| | |
| | |
| | |



| Item: | Cost: |
|---|---|
| Closer view of braided wire | |
| | |
| | |
| | |
| | |
| | |
| | |

| Item: | Cost: |
|-------|-------|
|       |       |
|       |       |
|       |       |
|       |       |
|       |       |
|       |       |
|       |       |
|       |       |

| Item: | Cost: |
|-------|-------|
| Open Juction box attached to the boxes that caught on fire |  |
|       |       |
|       |       |
|       |       |
|       |       |
|       |       |



# EXHIBIT "D"

Electronically FILED by Superior Court of California, County of Los Angeles on 10/29/2019 09:49 PM Sherri R. Carter, Executive Officer/Clerk of Court, by A. Salcedo,Deputy Clerk

Michael T. Stoller, Esq., State Bar No. 120241
STOLLER LAW GROUP, APC
5747 Hoback Glen Road
Calabasas, California 91302
Telephone: 310-245-4028
Email: michael.stoller@stollerlawgroup.com

Attorneys for Plaintiffs, FA SOLIMAN
MANAGEMENT, INC. and REEFTON, LLC.

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF LOS ANGELES –VAN NUYS EAST DISTRICT

| | |
|---|---|
| FA SOLIMAN MANAGEMENT, INC a California Corporation, and REEFTON,LLC, a California Limited Liability Company,<br><br>            Plaintiffs,<br><br>        vs.<br><br>REXFORD INDUSTRIAL REALTY, L.P. a Maryland Partnership, and REXFORD INDUSTRIAL REALTY, INC. A Maryland Corporation Inc. and DOES 1 through 100, inclusive,<br><br>            Defendants. | CASE NO.:<br><br>**COMPLAINT FOR:**<br><br>(1) Breach of Contract;<br>(2) Breach Of Implied Warranty Of Habitability;<br>(3) Breach Of Covenant Of Quiet Enjoyment;<br>(4) Negligence<br><br>JURY TRIAL DEMANDED |

        Plaintiffs FA SOLIMAN MANAGEMENT, INC. and REEFTON, LLC, (hereinafter SR) hereby allege as follows against Defendants REXFORD INDUSTRIAL REALTY, LP. and its general partner REXFORD INDUSTRIAL REALTY, INC and DOE defendants 1 through 100, inclusive ("Defendants").

## PRELIMINARY ALLEGATIONS

        1.    Plaintiff FA SOLIMAN MANAGEMENT, INC. (hereinafter "Plaintiff or "SOLIMAN") is a California corporation with its headquarters located at 20701 Dumont Street,

1  Woodland Hills, CA 91364, Los Angeles County, California, and within the jurisdiction of this

2  Court.

3      2.      Plaintiff REEFTON, LLC,(hereinafter "Plaintiff or REEFTON") is a California

4   Limited Liability Company with its headquarters located at 20701 Dumont Street, Woodland

5  Hills, CA 91364, and within the jurisdiction of this Court.

6      3.      Plaintiffs SOLIMAN and REEFTON (hereinafter SR) are tenants that occupy

7  three (3) warehouses (hereinafter Premises) and is a significant tenant of the Premises.

8      2.      Plaintiffs are informed and believe, and thereupon alleges, that Defendant

9  REXFORD INDUSTRIAL REALTY, LP.  ("RIR, LP") is a Maryland, limited partnership,

10  licensed and doing business in the State of California. Plaintiffs are informed and believe, and

11  thereupon alleges, that Defendant REXFORD INDUSTRIAL REALTY, INC.  ("RIR. INC") is

12  a Maryland Corporation, licensed and doing business in the State of California and is the

13  general partner for RIR, LP. Plaintiffs are further informed and believe, and thereupon allege,

14  that at all times herein mentioned, RIR, LP was an owner of a commercial property located at

15  18310,18314, and 18316 Oxnard Street, Tarzana, CA. 91356, Los Angeles, California

16  (hereinafter the "Warehouse"), exercised real or apparent authority regarding it, and was

17  therefore responsible for maintaining the Warehouse in a lawful and habitable condition, but

18  failed and refused to do so.

19      3.      The true names and capacities, whether individual, corporate, associate or

20  otherwise, of the Defendants named herein as DOES 1 through 100, inclusive, are unknown to

21  Plaintiffs who therefore sues said Defendants by such fictitious names. Plaintiffs are informed

22  and believe and thereon allege that each of the said DOE Defendants is responsible in some

23  manner for the happenings and events hereinafter alleged and negligently or otherwise caused

24  the losses and/or damages as herein alleged. Plaintiffs will seek leave to amend its complaint to

25  show the true names and capacities of said unknown Defendants when the same have been

26  ascertained.

27

28

**2**
**COMPLAINT**

4.      Plaintiffs are informed and believe and on such information and belief alleges that at all times herein mentioned, Defendants, and each of them, were the agents, servants, representatives and employees of the other Defendants, and each of them, and in doing the things herein alleged, were acting within the course and scope of such agency and employment.

5.      Plaintiffs are informed and believe and thereupon allege, that Defendants and each of them were owners, persons, and/or entities responsible for the management and maintenance of the Warehouse from June 2018 through the present, and that every Defendant was the agent or employee of every other Defendant.

6.      Wherever reference is made in this Complaint to any act or failure to act by a Defendant or Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant, whether acting individually, or jointly and severally.

7.      Wherever reference is made to individuals who are not named as Plaintiffs or Defendants in this complaint, but who are or were employees, agents, associates, joint venturers, managers, directors, board members, partners, trustees, and/or beneficiaries of Defendants and/or Defendants' companies or organizations, Plaintiffs asserts that the conduct of such individuals at all relevant times was on behalf of Defendants and was within the course and scope of their employment or agency.

## GENERAL STATEMENT OF FACTS COMMON TO ALL CAUSES OF ACTION

9.      Plaintiffs SR are in the disposable medical equipment (DME) business and related services for customers located throughout Southern California.

10.      Plaintiffs SR and RIR, INC. entered into a written lease for the Premises, on June13, 2018, which was amended on August 23,2018 and had a five (5) year term.  A true and correct copy of this lease and amendment is attached hereto as "**Exhibit A**."

11.      At the time the parties entered the lease the premises where taken "As –Is" however it was represented by Defendants through their agents and representatives that the structure and in particularly the electrical was up to code and the Premises would be suitable for the intended use of Plaintiffs for warehousing inventory and having a show room office.

However despite these representations and those contained in the lease and amendment Defendants concealed the fact that on information and belief used substandard and or unlicensed laborers or technicians to install and maintain the electrical wiring and panels of the Premises in order to cut corners and save money.

12.    It was understood and agreed between the parties that SR would undertake and did undertake extensive remodeling of the Premises.  SR expended in excess of $100,000.00 in the tenant improvements which resulted in upscale stylish showroom offices with new, hardwood floors, lighting and ceiling, among other things.

13.    The tenant improvements also included remodeling a suite to be used as a lounge for its employees since warehouse did not offer these types of amenities.

14.    The parties further discussed and agreed that since Plaintiffs was investing significant time and money for the tenant improvements that it would have the expectation to benefit from them during the term of the lease and any extensions thereafter.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

15.    Plaintiffs SF hereby incorporate all previous paragraphs of this Complaint by reference as though set forth at length herein.

16.    Plaintiffs SF and Defendant RIR, INC are parties to a contract, namely the lease and amendment attached hereto as "**Exhibit A**."

17.    Plaintiffs SF did all, or substantially all, of the significant things that the lease required it to do or was excused from doing those things.

18.    All conditions required by the lease for Defendant RI's performance had occurred or were excused.

19.    On August 11,2019, a fire started in which required the fire department to be called to extinguish the blaze. After the fire was extinguished the Fire Department reported that the cause of the fire was due to faulty wiring. The fire destroyed certain DME inventory that SF maintained in the Premises which were worth in excess of $128,000.00.

**4**
**COMPLAINT**

20.     Plaintiffs are informed and believe and based thereon believe that the fire began on the adjacent premises (18318 Oxnard, Units 13 and 14) which is occupied by a tenant that was illegally growing cannabis. Plaintiffs are further informed and believe and thereon allege that the illegal cannabis operation was utilizing certain grow lights and irrigation systems that excluded the normal loads of the electrical supply to this premises. Plaintiffs are further informed, believe and allege that RIR was aware that the adjacent tenants use of their premises was illegal and that the overload placed on the substandard electrical wiring and panels to the premises would forseeably cause damage to the premises and Plaintiffs' property if a problem or accident such as a fire occurred. After entering into the lease on June 13, 2018, Defendant RIR thereafter breached the contract by their conduct as alleged in ¶'s 11-15 above.

21.     Plaintiffs SR has suffered damages in excess of $128,000.00 as a result of said breach of contract, $128,000.00 is being exposed to a claim of damages for the adjacent tenant (18318 Oxnard, Units 13 and 14) for an amount presently unknown but in excess of $500,000.00.

22.     Plaintiffs SR is entitled to general and special damages, in an amount in excess of this Court's jurisdictional minimum, along with reasonable attorney's fees pursuant to the lease, interest, and all recoverable costs.

## SECOND CAUSE OF ACTION

### (Breach of Implied Warranty of Habitability)

23.     Plaintiffs reallege and incorporate by reference every allegation of the Complaint as though fully set forth in this paragraph.

24.     Plaintiffs were in a landlord-tenant relationship with Defendant, paying rent and occupying the premises, pursuant to a written lease agreement.

25.     Implied in each rental agreement in California, whether oral or written, is a warranty of habitability, which requires landlords to maintain premises in a habitable condition.

26.     By virtue of the landlord-tenant relationship and lease agreements identified in this Complaint, Defendants owed Plaintiffs a duty, as defined in applicable health and safety

1    codes, to maintain the premises in a habitable condition.

2        27.    Defendants have breached this duty and the implied warranty of habitability by

3    allowing the electrical wire, electric panel to the premises be substandard and below code and

4    utilized on information and belief unlicensed contractors and subcontractors, to perform the

5    work in substandard manner and that such work was never permitted and or inspected and

6    thereby caused the premises to be a hazard and ultimately lead to the fire to the premises.

7        28.    Defendants were aware of their obligation to maintain the Warehouse in a

8    habitable condition. Defendants negligently failed to properly maintain the Warehouse, despite

9    being aware that it was out of compliance with applicable building and safety codes. Defendants

10    knew, or reasonably should have known, that if a fire occurred by the faulty wiring and

11    electrical works Plaintiffs would suffer damage as a result of this breach.

12        29.    Plaintiffs has been damaged by Defendants' conduct in an amount equal to

13    rents due and paid by each Plaintiffs during the life of each Plaintiffs' tenancy, and the damages

14    sustained to the inventory and fixtures damaged by the fire which exceeds $128,000 or in an

15    amount to be proven at trial.

16        30.    In addition, as a direct and proximate result of Defendants, conduct and the

17    conditions outlined above, Plaintiffs has suffered and/or continues to suffer loss of business

18    income, loss in the value of its leasehold, property damage, and other economic damage in an

19    amount to be determined according to proof, but which amount is within the jurisdictional

20    requirements of this Court.

21    **FOURTH CAUSE OF ACTION**

22    **(Breach of Covenant of Quiet Enjoyment)**

23        31.    Plaintiffs reallege and incorporates by reference every allegation of the

24    Complaint contained in the preceding paragraphs, as though fully set forth in this paragraph.

25        32.    Plaintiffs has held a leasehold interest and have been tenants of the property

26    while the Defendants named in this cause of action have owned and managed it.

27        33.    Defendants have a duty to abide by the implied covenant of quiet enjoyment.

28

Defendants breached this duty and the implied covenant by their conduct described above. This egregious conduct includes negligently failing to repair unsafe and uninhabitable conditions at the premises and failing to maintain the premises in a habitable condition.

34.    Defendants knew, or reasonably should have known, that Plaintiffs would suffer damage as a result of this breach.

35.    As a direct and proximate result of Defendants' breach of the covenant of quiet enjoyment, the value of each leasehold held by Plaintiffs has been diminished. Consequently, Plaintiffs was damaged in an amount equal to rental payments due and paid during Plaintiffs' leasehold and to the inventory and fixtures damaged in the fire or in an amount to be proven at trial, as well as interest on payments made, pursuant to Civil Code section 3304.

36.    Pursuant to Civil Code section 3304, Plaintiffs is entitled to recover reasonable attorney fees and costs as expenses properly incurred in bringing this cause of action.

### FOURTH CAUSE OF ACTION

### (Negligence)

37**.**    Plaintiffs reallege and incorporates by reference every allegation of the Complaint contained in the preceding paragraphs, as though fully set forth in this paragraph.

38.    Defendant RI, owed Plaintiffs a duty to maintain the premises in a proper and safe manner and to make sure all work and maintenance especially to the electrical was done to code by licensed individuals.

39.    Defendant RI breached their duty of care to Plaintiffs by failing to maintain and inspect the premises to ensure it was proper and safe and to make sure all work and maintenance especially to the electrical was done to code by licensed individuals.

40.    As a direct and proximate result of the negligence of Defendants and each of them, Plaintiffs has sustained general and specific damages in the minimum amount of $128,000.00 which is within the jurisdiction of this court, but not yet fully ascertained, to be proven at the time of trial.  Plaintiffs will seek leave to amend this complaint to state the true amount when ascertained. $128,000.00 is being exposed to a claim of damages for the adjacent

**7**
**COMPLAINT**

tenant (18318 Oxnard, Units 13 and 14) for an amount presently unknown but in excess of $500,000.00.

41.     As a further proximate result of the negligence of Defendants, and each of them, Plaintiffs has incurred and will continue to incur legal, and related expenses, all to its special damage in an amount within the jurisdiction of this court but not yet fully ascertained, to be proven at the time of trial. Plaintiffs will seek leave to amend this complaint to state the true amount when ascertained.

### **PRAYER**

WHEREFORE, Plaintiffs prays for relief as follows:

1.     For an award of general and special damages.

2.     For compensatory damages, including all available economic and non-economic damages.

3.     For an award of nominal damages and actual damages in an amount to be proven at trial.

4.     For the rental value paid under the lease

5.     Attorney fees incurred.

6.     For Loss of Inventory and Fixtures in excess of $128,000.00

On all causes of action

1.     For costs of suit incurred herein in an amount to be proven at trial;

2.     For all available pre-and post-judgment interest; and

3.     For such other relief as the Court deems just and proper.

DATED : October 28, 2019.

*Michael Stoller*

By: _____
Michael Stoller, Esq.
Attorneys for Plaintiffs FA SOLIMAN
MANAGEMENT, INC and
REEFTON,LLC.

///

**8**
**COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

DATED : October  28, 2019.

*Michael Stoller*

By: _____
Michael Stoller, Esq.
Attorneys for Plaintiffs
FA SOLIMAN MANAGEMENT,
INC. and REEFTON, LLC.

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

**COMPLAINT**

# FIRST AMENDMENT TO LEASE

**THIS FIRST AMENDMENT TO LEASE AGREEMENT** (the "**Amendment**") is entered into as of the 23rd day of August, 2018, by and between Rexford Industrial Realty, L.P., a Maryland limited partnership ("**Landlord**") and F A Soliman Management Inc, a California corporation, and Reefton, LLC, a California limited liability company, jointly and severally ("**Tenant**").

## W I T N E S S E T H :

WHEREAS, Landlord and Tenant have entered into a Lease dated June 13, 2018, pursuant to which Landlord leased to Tenant certain premises consisting of approximately 7,096 square feet located at 18310 & 18316 Oxnard Street, Tarzana, California, 91356 (the "**Original Premises**"), such lease, as heretofore modified, being herein referred to as the "**Lease**".

NOW, THEREFORE, Landlord and Tenant desire to modify the Lease to, among other things, to expand the Premises upon the terms and conditions set forth herein.

## A G R E E M E N T :

NOW THEREFORE, in consideration of the Premises and the mutual covenants hereinafter contained, the parties hereto agree as follows:

1. Effective October 1, 2018 (the "**Expansion Date**"), the "Premises" (as defined in the Lease) shall be expanded to include that certain premises commonly known as 18314 Oxnard Street, Unit 5, Tarzana, California, 91356, comprised of an approximately 2,936 rentable square foot unit (the "**Expansion Premises**"), on the terms and conditions set forth in the Lease, as hereby amended. Effective upon the Expansion Date, all references in the Lease to the "Premises" shall also include the Expansion Premises, except as expressly provided in this Amendment.

   A site plan depicting the Expansion Premises is attached hereto and made a part here of as Exhibit "A".

2. Tenant shall accept the Expansion Premises in its "as is" condition, without any representations or warranties. The taking of possession of the Expansion Premises shall be conclusive evidence that Tenant accepts the Expansion Premises and that the Expansion Premises were in good condition at the time possession was taken except for any punchlist items agreed to in writing by Landlord and Tenant pursuant to the attached Move-In/Move-Out checklist. Prior to the Expansion Date, Tenant shall deliver to Landlord a Certificate of Insurance and Endorsement for the Expansion Premises in compliance with Section 8 of the Lease.

3. Tenant hereby acknowledges that as of the date of this Lease, the Expansion Premises are occupied by an existing tenant (the "**Existing Tenant**"). Tenant hereby acknowledges and agrees that this Amendment is contingent upon Landlord and Existing Tenant entering into a termination agreement prior to the Expansion Date. Landlord shall not deliver possession of

INITIALS

the Expansion Premises to Tenant until Landlord has obtained lawful possession of the Expansion Premises from the Existing Tenant.

4. Base Rent.

    a. Tenant shall continue to pay Base Rent for the Original Premises pursuant to the Lease.

    b. The term for the Expansion Premises shall commence on the Expansion Date and shall expire November 30, 2023 (the "**Expansion Premises Term**"). The monthly Base Rent for the Expansion Premises shall be as follows:

| Period | Monthly Base Rent |
|---|---|
| October 1, 2018 – September 30, 2019 | $4,022.32 |
| October 1, 2019 – September 30, 2020 | $4,142.99 |
| October 1, 2020 – September 30, 2021 | $4,267.28 |
| October 1, 2021 – September 30, 2022 | $4,395.30 |
| October 1, 2022 – November 30, 2023 | $4,527.16 |

5. Tenant shall continue to pay Common Area Operating Expenses as provided in the Lease applicable to the Original Premises pursuant to the Lease. During the Expansion Premises Term, Tenant shall pay Common Area Operating Expenses as provided in the Lease applicable to the Expansion Premises, currently estimated to be a total of $322.96 per month. Lessee's Share (as defined in Paragraph 1.6 of the Lease) of the Common Area Operating Expenses for the Expansion Premises  is three and eighty-eight hundredths percent (3.88%).

6. The "Base Year" for Insurance Cost Increases and increases in Real Property Taxes applicable to the Expansion Premises shall be the calendar year 2018.

7. Landlord currently holds a Security Deposit for the Original Premises in the amount of $20,000.00.  The Security Deposit for the Expansion Premises shall be $4,500.00 and shall be held by Landlord in accordance with the terms of Section 5 of the Lease.  Upon the Expansion Date, the Security Deposit to be held by Landlord for the Premises shall be a total of $24,500.00.

8. Upon execution of this Amendment, a total of $8,845.28 shall be due, which is the sum of the Security Deposit for the Expansion Premises ($4,500.00), the estimated Common Area Operating Expenses for the Expansion Premises for the calendar month of October 2018 ($322.96) and the Base Rent for the Expansion Premises for the calendar month of October 2018 ($4,022.32).

9. Notwithstanding anything herein to the contrary but subject to Tenant not being in default and all prior rental payments having been received by Landlord not later than the fifth (5th) of each month, the Base Rent (and only the Base Rent) applicable to the Expansion Premises only, for the calendar months of November 2018, October 2019 and October 2020 shall be discounted by one hundred percent (100%) per month (cumulatively, the "**Expansion Premises Base Rent Credit**"). Tenant understands and agrees that the foregoing Expansion Premises Base Rent Credit is conditioned upon Tenant's not being in default under this Lease.  Accordingly, upon the occurrence of any default under this Lease, the foregoing Expansion Premises Base Rent

_____

INITIALS

Credit shall immediately become null and void, and any Base Rent previously credited to Tenant shall immediately become due and payable, and Tenant shall no longer receive any credit on account of such Expansion Premises Base Rent Credit.

10. Upon the Expansion Date, Tenant shall be entitled to the use of an additional five (5) unreserved vehicle parking spaces, the use of which shall be subject to the terms and conditions of Section 3.E. of the Lease.

11. Tenant warrants, represents and certifies to Landlord that as of the date of this Amendment, (i) Landlord is not in default under the Lease, (ii) Tenant does not have any defenses or offsets to payment of rent and performance of its obligations under the Lease as and when the same become due; (iii) Tenant has no remaining renewal, extension or termination options or rights of first offer or first refusal in the Original Premises; (iv) Tenant has not heretofore assigned or sublet all or any portion of its interest in the Lease or in the Original Premises; (v) no other person, firm or entity has any right, title or interest in the Lease or in the Original Premises through Tenant; (vi) Tenant has the full right, legal power and actual authority to enter into this Amendment without the consent of any person, firm or entity.

12. Tenant represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than NAI Capital, and Tenant agrees to indemnify and hold Landlord harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction.

13. Except as otherwise expressly provided herein, all defined terms used in this Amendment shall have the same respective meanings as are provided for such defined terms in the Lease. Insofar as the specific terms and provisions of this Amendment purport to amend or modify or are in conflict with the specific terms, provisions and exhibits of the Lease, the terms and provisions of this Amendment shall govern and control; in all other respects, the terms, provisions and exhibits of the Lease shall remain unmodified and in full force and effect.

14. Landlord and Tenant hereby agree that (i) this Amendment is incorporated into and made a part of the Lease, (ii) any and all references to the Lease hereinafter shall include this Amendment, and (iii) the Lease and all terms, conditions and provisions of the Lease are in full force and effect as of the date hereof, except as expressly modified and amended hereinabove.

15. A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or Landlord may not prohibit the Tenant or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the Tenant or tenant, if requested by the Tenant or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the Premises.

Landlord makes the following statement based on Landlord's actual knowledge in order to

INITIALS

comply with California Civil Code Section 1938: The Building and the Premises have not undergone an inspection by a Certified Access Specialist (CASp). Landlord and Tenant hereby mutually agree that in the event a CASp inspection is requested by Tenant, the fee for the CASp inspection and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within and outside the Premises noted in the CASp inspection shall be paid by Tenant.

16. LANDLORD HEREBY DISCLOSES TO TENANT THAT LANDLORD KNOWS OR HAS REASONABLE CAUSE TO BELIEVE THAT ASBESTOS-CONTAINING MATERIALS ARE PRESENT IN THE BUILDING AND THE PREMISES. TENANT ACKNOWLEDGES THAT LANDLORD HAS SATISFIED ITS OBLIGATION TO NOTIFY TENANT OF THE PRESENCE OF ASBESTOS-CONTAINING MATERIALS IN THE BUILDING PURSUANT TO CALIFORNIA HEALTH & SAFETY CODE SECTION 25359.7, AND TENANT SHALL NOT DISTURB ANY ASBESTOS-CONTAINING MATERIALS.

17. Tenant agrees and understands that Landlord shall have the right (provided that the exercise of Landlord's rights does not materially and adversely affect Tenant's use and occupancy of the Premises or subject Tenant to additional costs, without Tenant's consent, to place a solar electric generating system on the roof of the Building or enter into a lease for the roof of the Building whereby such roof lessee shall have the right to install a solar electric generating system on the roof of the Building, and Landlord and its agents shall have access to the roof to accomplish the foregoing.

18. Each party hereto, and their respective successors and assigns shall be authorized to rely upon the signatures of all of the parties hereto on this Amendment which are delivered by facsimile or PDF as constituting a duly authorized, irrevocable, actual, current delivery of this Amendment with original ink signatures of each person and entity. This Amendment may be executed in counterparts, each of which shall be deemed an original part and all of which together shall constitute a single agreement.

[Signature Page Follows]

INITIALS

IN WITNESS WHEREOF, the parties hereto have signed this Amendment as of the day and year first above written.

**TENANT:**

F A SOLIMAN MANAGEMENT INC, a California corporation,
and REEFTON, LLC, a California limited liability company, jointly and severally

By: _____

Name: _____

Title: _____

Date: _____


By: _____

Name: _____

Title: _____

Date: _____


**LANDLORD:**

REXFORD INDUSTRIAL REALTY, L.P.,
 a Maryland limited partnership

    By: Rexford Industrial Realty, Inc.,
       a Maryland corporation,
       Its General Partner


      By: _____

      Name Printed: <u>Howard Schwimmer</u>

      Title: <u>Co-Chief Executive Officer</u>

      Date: _____

INITIALS

EXHIBIT A

Expansion Premises



SUBJECT PREMISES

Not to scale. Does not constitute a representation or warranty regarding the Project or any portion thereof, and Landlord reserves the right to modify any portion of the Project in its sole discretion as provided in the Lease.

INITIALS

**Rexford Industrial**

**TENANT MOVE-IN/MOVE-OUT CHECKLIST**

| | |
|---|---|
| ENTITY NAME: | |
| TENANT NAME: | |
| PREMISES ADDRESS: | |
| POSSESSION DATE: | |
| MOVE-OUT DATE: | |

*Unless otherwise noted, the premises are clean, in good working order and undamaged.  Occupant accepts the Premises as-is with the exceptions listed below.  This inspection form is made a part of and is subject to the terms and conditions of the Commercial Lease for the above referenced Premises.*

| OFFICE AREAS | MOVE-IN CONDITION | MOVE-OUT CONDITION |
|---|---|---|
| CARPET | | |
| FLOORING | | |
| CEILING | | |
| DOORS | | |
| HVAC | | |
| LIGHTS | | |
| WALLS | | |
| WINDOW COVERINGS | | |
| KITCHEN AREA | | |

| RESTROOMS | MOVE-IN CONDITION | MOVE-OUT CONDITION |
|---|---|---|
| FLOORING | | |
| CEILING | | |
| DOORS | | |
| LIGHTS | | |
| WALLS | | |
| FIXTURES | | |
| MIRRORS | | |
| PLUMBING | | |
| FANS | | |

| WAREHOUSE | MOVE-IN CONDITION | MOVE-OUT CONDITION |
|---|---|---|
| FLOORING | | |
| CEILING | | |
| MAN DOORS | | |
| LOADING DOORS | | |
| LIGHTS | | |
| WALLS | | |
| SKYLIGHTS | | |
| COLUMNS | | |
| DOCK EQUIPMENT | | |
| FIRE SPRINKLERS | | |
| ELEC PANEL/DISTRIBUTION | | |

| SINGLE TENANT BUILDING | MOVE-IN CONDITION | MOVE-OUT CONDITION |
|---|---|---|
| LANDSCAPE | | |
| PAVING / YARD AREA | | |
| EXTERIOR MISC | | |

| ADDITIONAL COMMENTS | MOVE-IN CONDITION | MOVE-OUT CONDITION |
|---|---|---|
| | | |
| | | |

*The "Move-In Condition" portion of this form is to be completed at the time of initial possession of the Premises.  Receipt of a copy of this inspection form is hereby acknowledged.*

TENANT SIGNATURE:
DATE:
LANDLORD SIGNATURE:
DATE:

*The "Move-Out Condition" portion of this form is to be completed at the time of Tenant move-out of the Premises.  Receipt of a copy of this inspection form is hereby acknowledged.*

TENANT SIGNATURE:
DATE:
LANDLORD SIGNATURE:
DATE:

DocuSign Envelope ID: Case 2:20-bk-10181-VZ Doc 37 Filed 01/30/20 Entered 01/30/20 12:08:08 Desc
Main Document Page 56 of 77

DocuSign Envelope ID: BD7274FC-D336-47C1-8BEB-23H7A02C2EEB



## Rexford Industrial

### REXFORD INDUSTRIAL REALTY
### STANDARD INDUSTRIAL
### MULTI-TENANT LEASE – MODIFIED GROSS

This Lease (**"Lease"**), dated **June 13, 2018**, is made by and between Rexford Industrial Realty, L.P., a Maryland limited partnership (**"Landlord"**), and the Tenant named below (collectively the **"Parties,"** or individually a **"Party"**).

1.     **BASIC LEASE PROVISIONS**

| | | |
|---|---|---|
| A. | Tenant: | F A Soliman Management Inc a California corporation, and Reefton, LLC, a California limited liability company, jointly and severally |
| B. | Premises: | An approximately 7,096 rentable square foot portion of the building located at the street address of 18310 & 18316 Oxnard Street, located in the City of Tarzana, County of Los Angeles, State of California, with zip code 91356, as shown on Exhibit "A" attached hereto (**"Premises"**). In addition to Tenant's rights to use and occupy the Premises as hereinafter specified, Tenant shall have non-exclusive rights to any Common Areas (as defined in Section 3.A. below) of the building containing the Premises (**"Building"**) but shall not have any rights to the roof, or exterior walls of the Building or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings and improvements thereon, are here in collectively referred to as the **"Project."** |
| C. | Parking Spaces: | Fourteen (14) unreserved vehicle parking spaces. |
| D. | Commencement Date: | September 15, 2018 |
| E. | Lease Term: | Sixty-Two (62) full calendar months following the Commencement Date and ending on November 30, 2023 (**"Expiration Date"**). |
| F. | Security Deposit: | $20,000.00 |

G.     Base Rent:

| Period | Monthly Base Rent |
|---|---|
| Commencement Date through September 30, 2019 | $9,579.60* |
| October 1, 2019 through September 30, 2020 | $9,866.99 |
| October 1, 2020 through September 30, 2021 | $10,163.00 |
| October 1, 2021 through September 30, 2022 | $10,467.89 |
| October 1, 2022 through November 30, 2023 | $10,781.92 |

*Subject to Base Rent Credit as set forth in Section 4.D. below.

| | | |
|---|---|---|
| H. | Tenant's Share: | 9.38% of the Project |
| I. | Current estimate of Tenant's Share of estimated monthly Operating Expenses (excluding current Base Real Property Taxes and the Base Premium for the Base Year) (estimate only and subject to adjustment based on actual costs and expenses according to the provisions of this Lease) | $780.56 |
| J. | Base Year | 2018 |

K.     Base Rent and other Monies Due Upon Execution by Cashier's Check:

| | |
|---|---|
| Base Rent (September 15, 2018 – October 31, 2018) | $14,688.72 |
| Security Deposit | $20,000.00 |
| Estimated Operating Expenses (September 15, 2018 – October 31, 2018) | $1,196.86 |
| Total Amount Due on Lease Execution | $35,885.58 |

| | | |
|---|---|---|
| L. | Early Possession Date: | Upon mutual Lease execution, upon completion of Landlord suite preparation, and subject to the terms of Section 2.E. |
| M. | Permitted Use: | Warehousing and distribution of pharmaceuticals. |
| N. | Broker(s): | NAI Capital representing Landlord (**"Landlord's Broker"**). NAI Capital representing Tenant (**"Tenant's Broker"**). |
| O. | Guarantor: | None |
| P. | Exhibits: | Exhibit "A" - Site Plan Depicting the Premises and Project; Exhibit "B" - Rules and Regulations; Exhibit "C" – Tenant Contact Information Form |
| Q. | Addenda: | Move-In/Move-Out Checklist |



INITIALS

2. **Granting and Acceptance of Premises.**

   A. **Grant of Premises and Term.** In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant takes from Landlord, the Premises, to have and to hold for the Lease Term, subject to the terms, covenants and conditions of this Lease. Base Rent set forth in this Lease is not subject to adjustment should the actual size of the Premises be determined to be different than the approximate size described in the Basic Lease provisions. In the event that the size of the Premises and/or the Project are modified during the Lease Term, Landlord may recalculate Tenant's Share to reflect such modification.

   B. **Condition.** Tenant shall accept the Premises in its condition as of the Commencement Date, AS-IS AND WITH ALL ITS FAULTS, subject to all applicable laws, ordinances, regulations, covenants and restrictions. Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes. In no event shall Landlord have any obligation for any defects in the Premises or any limitation on its use. Tenant is advised to verify the actual size prior to executing this Lease. Tenant acknowledges that it has had the opportunity to inspect the suitability of the Premises for Tenant's intended use (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with any building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("**Legal Requirements**"), including the Americans with Disabilities Act), and to measure the Premises. NOTE: Tenant is responsible for determining whether or not the Legal Requirements, and, including, without limitation, the zoning, are appropriate for Tenant's intended use, and acknowledges that past uses of the Premises may no longer be allowed. Tenant represents and warrants that it has obtained (or will obtain prior to taking possession of the Premises) all required occupancy permits from the applicable municipality and other agencies having jurisdiction over the Premises. The taking of possession of the Premises shall be conclusive evidence that Tenant accepts the Premises and that the Premises were in good condition at the time possession was taken subject to the terms that are Landlord's responsibility under Section 7.B. and any punchlist items agreed to in writing by Landlord and Tenant. No later than 10 days after written demand is made therefor by Landlord of Tenant, Tenant shall execute and deliver to Landlord a Tenant Contact Information Sheet in the form of Exhibit "C", each as attached to and hereby made a part of this Lease. Landlord shall deliver the Premises contained within the Building to Tenant broom clean and free of debris on the Commencement Date or any Early Possession Date, whichever first occurs. Except as otherwise disclosed to Tenant in writing and so long as the required service contracts described in Section 7.A(2) below are obtained by Tenant and in effect within 30 days following the Commencement Date, Landlord warrants (i) the heating, ventilating and air conditioning systems ("**HVAC**") serving the Premises for a period of 6 months following the Commencement Date, and (ii) the existing electrical, plumbing, fire sprinkler, lighting, loading doors, sump pumps, if any, and all other such Building systems serving the Premises for a period of 6 months; provided, however, that such warranty shall not be effective for any maintenance, repairs or replacements necessitated due to the misuse of, or damage caused by, Tenant, its employees, contractors, agents, subtenants, or invitees. If Tenant does not give Landlord the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Tenant at Tenant's sole cost and expense. No person acting on behalf of Landlord is authorized to make, and Tenant acknowledges and agrees that Landlord has not made and specifically negates and disclaims, any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning or with respect to the Premises, except as expressly set forth herein.

   C. **Compliance.** Except as provided in Section 7.B. below, in no event shall Landlord have any obligation for any defects in the Premises or any limitation on its use. If Legal Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Material, or other physical modification of the Premises and/or Building ("**Capital Expenditure**"), Landlord and Tenant shall allocate the cost of such work as follows:

      (1) Subject to subsection 3 below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Tenant as compared with uses by tenants in general, Tenant shall be fully responsible for the cost thereof.

      (2) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Tenant (such as, governmentally mandated seismic modifications), then Landlord shall pay for such Capital Expenditure and Tenant shall only be obligated to pay, each month during the remainder of the term of this Lease (including any extensions or renewals thereof), on the date on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Tenant shall pay interest of ten percent (10%) per annum on the remaining balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Landlord reasonably determines that it is not economically feasible or is commercially impracticable to pay its share thereof, Landlord shall have the option to terminate this Lease upon 90 days prior written notice to Tenant unless Tenant notifies Landlord, in writing, within 10 days after receipt of Landlord's termination notice that Tenant will pay for the entire cost of such Capital Expenditure in immediately available funds.

      (3) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Legal Requirements. If the Capital Expenditures are instead triggered by Tenant as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then Tenant shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) following Landlord's written demand, complete such Capital Expenditure at its own expense. Tenant shall not have any right to terminate this Lease in accordance with this Section.

   D. **Tenant as Prior Owner/Occupant.** The warranties, covenants and agreements made by Landlord in this Section shall be of no force or effect if previously Tenant (or any person or entity with whom Tenant is or was affiliated) was the owner or occupant of the Premises. In such event, Tenant shall be responsible for any necessary corrective work.

   E. **Early Possession.** Any provision herein granting Tenant Early Possession of the Premises is subject to and conditioned upon (i) the Premises being available for such possession prior to the Commencement Date, (ii) upon full payment of monies due by Landlord's check and (iii) Landlord's receipt of certificates of insurance as required in this Lease. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises subject to the terms of this Lease. During such Early Possession, Tenant shall be bound by its obligations under the Lease but shall not be obligated to pay the Monthly Base Rent or Operating Expenses payable by Tenant to Landlord as set forth in the Lease.

   F. **Delay In Possession.** Landlord agrees to use commercially reasonable efforts to deliver possession of the Premises to Tenant by the Commencement Date. If, despite said efforts, Landlord is unable to deliver possession by such date, Landlord shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date. Tenant shall not, however, be obligated to pay Rent until Landlord delivers possession of the Premises and any period of rent abatement that Tenant would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Tenant would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Tenant.

   G. **Tenant Compliance.** Landlord shall not be required to tender possession of the Premises to Tenant until Tenant complies with its obligation to provide evidence of insurance (Section 8.B.). Pending delivery of such evidence, Tenant shall be required to perform all of its obligations under this Lease from and after the Commencement Date, including the payment of Rent, notwithstanding Landlord's election to withhold possession pending receipt of such evidence of insurance. Further, if Tenant is required to perform any other conditions prior to or concurrent with the Commencement Date, the Commencement Date shall occur but Landlord may elect to withhold possession until such conditions are satisfied.

3. **Common Areas.**

   A. **Common Areas. "Common Areas"** shall mean all areas of the Project for the common use or benefit of the tenants of the Project and their employees, agents, and other invitees, including, without limitation: all parking areas, pedestrian walkways, driveways and access roads, and entrances and exits.

   B. **Common Areas - Tenant's Rights.** Landlord grants to Tenant, for the benefit of Tenant and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Landlord under the terms hereof or under the terms of any Rules and Regulations or restrictions governing the use of the Project. Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property (including, without limitation, pallets), temporarily or permanently, in the Common Areas, nor shall Tenant conduct any business from the Common Areas at any time, including without limitation, loading or unloading materials or supplies within or from the Common Areas (unless Landlord has designated loading areas within such Common Areas). Any such storage shall be permitted only by the prior written consent of Landlord, which consent may be revoked at any time. In the event that any unauthorized storage shall occur, then Landlord shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Tenant, which cost shall be immediately payable upon demand by Landlord.

INITIALS

C. **Common Areas - Rules and Regulations.** Tenant shall, at all times during the Lease Term and any extension thereof, comply with all reasonable rules and regulations at any time or from time to time established by Landlord covering use of the Premises and the Project. The current Project Rules and Regulations are attached hereto as Exhibit "B." In the event of any conflict between said Rules and Regulations and other provisions of this Lease, the other terms and provisions of this Lease shall control. Landlord shall not have any liability or obligation for the breach of any Rules or Regulations by other tenants in the Project. Tenant shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Tenant will make use of all of the Common Areas (including, without limitation, all loading and unloading areas) in a cooperative, harmonious fashion, and shall not block or unreasonably interfere with access by others in the Project to their premises or loading areas.

D. **Common Areas – Changes.** Landlord shall have the right, in Landlord's sole discretion, from time to time, to make changes to the Project, including, without limitation, granting easements, making public dedications, designating and modifying Common Areas and creating restrictions on or about the Project, changing the location, size, shape and number of driveways, entrances, parking spaces and the number of assigned parking spaces proportionately if reduced or reallocated at the Project, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways; temporarily closing any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available; designating other land outside the boundaries of the Project to be a part of the Common Areas; adding additional buildings and improvements to the Common Areas; using the Common Areas while making additional improvements, repairs or alterations to the Project; and performing such other acts and making such other changes in, to or with respect to the Common Areas and Project as Landlord may deem to be appropriate.

E. **Vehicle Parking.** Tenant shall be entitled to use only the number of Parking Spaces specified in the Basic Lease Provisions on those portions of the Common Areas designated from time to time by Landlord for parking. Said parking spaces shall be used for parking by vehicles no larger than full-size passenger automobiles or pick-up trucks, herein called **"Permitted Size Vehicles."** Landlord may regulate the loading and unloading of vehicles by adopting Rules and Regulations as provided in this Lease. No vehicles other than Permitted Size Vehicles may be parked in the Common Area without the prior written permission of Landlord. The parking areas of the property shall be used for parking of Permitted Size Vehicles and, subject to Landlord's rules and regulations, the loading and unloading of trucks only. The use by Tenant of those areas for storage material (including pallets) is expressly prohibited. All material shall be stored within the Building. Landlord may allocate and assign parking spaces among Tenant and other tenants in the Project if Landlord reasonably determines that such parking facilities are becoming crowded. Landlord shall not be responsible for enforcing Tenant's parking rights against any third parties. In addition:

(1) Tenant shall not permit or allow any vehicles that belong to or are controlled by Tenant or Tenant's employees, suppliers, shippers, customers, contractors or invitees to be loaded, unloaded, or parked in areas other than those designated by Landlord for such activities.

(2) Tenant shall not service or store any vehicles in the Common Areas.

(3) Tenant shall not park any vehicles overnight in the Parking Spaces, the Common Areas, or anywhere else in the Project.

(4) If Tenant permits or allows any of the prohibited activities described in this Section, then Landlord shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Tenant, which cost shall be immediately payable upon demand by Landlord.

4. **Rent.**

A. **Rent Defined.** Any payments or charges due from Tenant (other than the Security Deposit) to Landlord hereunder shall be considered rent for all purposes of this Lease (**"Rent"**).

B. **Operating Expenses.** During each month of the Lease Term, on the same date that Base Rent is due, Tenant shall pay Landlord an amount equal to 1/12 of the annual cost, as estimated by Landlord from time to time, of Tenant's Share of all Operating Expenses for the Project. Payments thereof for any fractional calendar month shall be prorated. The term **"Operating Expenses"** means all costs and expenses incurred by Landlord with respect to the ownership, maintenance, and operation of the Project including, but not limited to, costs of any of the following if at the Project:

(1) Costs relating to the operation, replacement, repair and maintenance, in neat, clean, good order and condition, of any of following if incurred by Landlord:

(a) The Common Areas and Common Area improvements, including parking areas, loading and unloading areas, trash areas, roadways, parkways, walkways, driveways, landscaped areas, bumpers, irrigation systems, Common Area lighting facilities, fences and gates, elevators, roofs, exterior walls of the buildings, building systems and roof drainage systems.

(b) Exterior signs and any tenant directories.

(c) Any fire sprinkler systems.

(d) All other areas and improvements that are within the exterior boundaries of the Project but outside of the Premises and/or any other space occupied by a tenant.

(2) The cost of water, gas, electricity and telephone to service the Common Areas and any utilities not separately metered.

(3) The cost of pest control services, property management, security services, owner's association dues and fees, the cost to repaint the exterior of any structures and the cost of any environmental inspections.

(4) The cost of trash disposal for any trash receptacles located in the Common Areas and/or available for the use of tenants (if Landlord operates the Project in a manner such that tenants do not directly contract for trash collection services).

(5) Reserves set aside for maintenance and repair of Common Areas and Common Area equipment.

(6) Any deductible portion of an insured loss concerning the Building or the Common Areas.

(7) Auditors', accountants' and attorneys' fees and costs related to the operation, maintenance, repair and replacement of the Project.

(8) The cost of any capital improvement (as opposed to maintenance, repair or replacements) to the Building or the Project not covered under the provisions of Section 2.C; provided, however, that Landlord shall allocate the cost of any such capital improvement over a 12 year period and Tenant shall not be required to pay more than Tenant's Share of 1/144th of such capital improvement in any given month.

(9) The cost of any other services to be provided by Landlord that are stated elsewhere in this Lease to be a Common Area Operating Expense.

(10) Any Real Property Tax Increase (as defined in this Section below).

(11) Any Insurance Cost Increase (as defined in this Section below).

As referenced in this Lease, the term **"Real Property Tax Increase"** shall mean the Real Property Taxes for the applicable year in excess of the Base Real Property Taxes. As used herein, the term **"Base Real Property Taxes"** shall be the amount of Real Property Taxes (defined in Section 10.A.), which are assessed against the Premises, Building, Project or Common Areas in the Base Year. In calculating Real Property Taxes for any calendar year, the Real Property Taxes for any real estate tax year shall be included in the calculation of Real Property Taxes for such calendar year based upon the number of days which such calendar year and tax year have in common. The **"Insurance Cost Increase"** shall mean the increase in the actual cost of the insurance applicable to the Building and/or the Project (including any deductibles which are paid in connection with any filed insurance claims) carried by Landlord pursuant to Section 8.A. over and above the Base Premium, as hereinafter defined, calculated on an annual basis. Insurance Cost Increase shall include, but not be limited to, requirements of the holder of a mortgage or deed of trust covering the Premises, Building and/or Project, increased valuation of the Premises, Building and/or Project, and/or a general premium rate increase. The **"Base Premium"** shall be the annual premium for insurance applicable to the Building and/or the Project carried by Landlord pursuant to Section 8.A. during the Base Year. If, however, the Project was not insured for the entirety of such 12 month period, then the Base Premium shall be the lowest annual premium reasonably obtainable for such insurance as of the Occupancy Date, assuming the most nominal use possible of the Building.

INITIALS

Any Operating Expenses and Real Property Taxes that are specifically attributable to the Premises, the Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Premises, Building, or other building. Notwithstanding any contrary provision contained in this Lease, Landlord shall have the right, from time to time, to equitably allocate some or all of the Operating Expenses for the Project into separate cost pools as described below (the "Operating Expense Pools"), in Landlord's sole discretion. If any line item(s) of Tenant's Share of Operating Expenses are incurred or assessed with respect to a portion of the Project that includes the Premises but does not include the entire Project, the denominator for the purpose of calculating Tenant's Share of the applicable line item(s) of Tenant's Share of Operating Expenses will be adjusted to exclude the square footage of the portions of the Project to which such line item(s) do not relate, thereby creating separate Operating Expense Pools and different Tenant's Shares with respect to each such Operating Expense Pool. Each Operating Expense Pool denominator and, consequently, Tenant's Share, shall be subject to modification each year of the Lease Term, as reasonably determined by Landlord.

Within 60 days after written request (but not more than once each year) Landlord shall deliver to Tenant a reasonably detailed statement showing Tenant's Share of the actual Operating Expenses for the preceding year. If Tenant's payments during such year exceed Tenant's Share, Landlord shall credit the amount of such over-payment against Tenant's future payments of Operating Expenses. If Tenant's payments during such year were less than Tenant's Share, Tenant shall pay to Landlord the amount of the deficiency within 10 days after delivery by Landlord to Tenant of the statement. Operating Expenses shall not include any expenses paid by any tenant directly to third parties, or as to which Landlord is otherwise reimbursed by any third party, other tenant, or insurance proceeds.

C.　　**Payment.** Tenant shall pay Base Rent in the amount set forth in the Basic Lease Provisions of this Lease. The Total Amount Due on Lease Execution, as shown in Section 1.K, shall be due and payable on the date hereof by cashier's check, and Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent on or before the first day of each calendar month succeeding the Commencement Date. Payments of Base Rent and estimated Operating Expenses for any fractional calendar month shall be prorated based on the actual days of said month. All payments required to be made by Tenant to Landlord hereunder (or to such other party as Landlord may from time to time specify in writing) shall be made by check or by Electronic Fund Transfer ("EFT") of immediately available federal funds before 5:00 p.m., Pacific Time at such place, as Landlord may from time to time designate to Tenant in writing. The obligation of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Tenant shall have no right at any time to abate, reduce, or set-off any rent due hereunder except as may be expressly provided in this Lease. If Tenant is delinquent in any monthly installment of Base Rent or of estimated Operating Expenses for more than 5 days after the due date, Tenant shall pay to Landlord on demand a late charge equal to the greater of ten percent (10%) of such delinquent sum or $100. The provision for such late charge shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as a penalty.

D.　　**Base Rent Credit.** Notwithstanding anything herein to the contrary but subject to Tenant not being in default and all prior rental payments having been received by Landlord not later than the fifth (5th) of each month, the Base Rent (and only the Base Rent) for the calendar month of November 2018 shall be discounted by fifty percent (50%) (the "**Base Rent Credit**"). Tenant understands and agrees that the foregoing Base Rent Credit is conditioned upon Tenant's not being in default under this Lease. Accordingly, upon the occurrence of any default under this Lease, the foregoing Base Rent Credit shall immediately become null and void, and any Base Rent previously credited to Tenant shall immediately become due and payable, and Tenant shall no longer receive any credit on account of such Base Rent Credit.

5.　　**Security Deposit.** The Security Deposit shall be held by Landlord as security for the performance of Tenant's obligations under this Lease. If Tenant fails to pay Rent, or otherwise an Event of Default occurs under this Lease, Landlord may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Landlord, for Rents which will be due in the future, and/or to reimburse or compensate Landlord for any liability, expense, loss or damage which Landlord may suffer or incur by reason thereof. If Landlord uses or applies all or any portion of the Security Deposit, Tenant shall within 10 days after written request therefor deposit monies with Landlord sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Tenant shall, upon written request from Landlord, deposit additional monies with Landlord so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Permitted Use be amended to accommodate a material change in the business of Tenant or to accommodate a sublessee or assignee, Landlord shall have the right to increase the Security Deposit to the extent necessary, in Landlord's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. Landlord may use, apply or retain all or any portion of the Security Deposit (i) first, for Tenant's repair obligations, including without limitation, the obligation to restore the Premises to the condition required under this Lease, (ii) second, to the payment of any rent or other sum in default or for the payment of any other sum to which Tenant may become obligated by reason of Tenant's default, and (iii) third, to compensate Landlord for any loss or damage which Landlord may suffer thereby. If a change in control of Tenant occurs during this Lease and following such change the financial condition of Tenant is, in Landlord's reasonable judgment, significantly reduced, Tenant shall deposit such additional monies with Landlord as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Landlord shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Landlord shall return that portion of the Security Deposit not used or applied by Landlord. Landlord shall upon written request provide Tenant with an accounting showing how that portion of the Security Deposit that was not returned was applied. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Tenant under this Lease (including, without limitation, Base Rent). Tenant hereby waives California Civil Code Section 1950.7, and all other provisions of law, now or hereafter in force, which may provide that Landlord can claim from a security deposit only those sums reasonably necessary to remedy defaults in the payment of rent, to repair damage caused by Tenant or to clean the Premises, it being agreed that Landlord may, in addition, claim those sums reasonably necessary to compensate Landlord for any other loss or damage, foreseeable or unforeseeable, caused by the act or omission of Tenant or any officer, employee or agent of Tenant.

6.　　**Use; Hazardous Materials; Compliance.**

A.　　**Use.** Tenant shall use and occupy the Premises only for the Permitted Use (or a related legal use), and for no other purpose. Tenant shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Landlord shall not unreasonably withhold or delay its consent to any written request for a modification of the Permitted Use, so long as the same will not impair the structural integrity of the Building or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Project.

B.　　**Hazardous Materials.**

(1)　　**Reportable Uses Require Consent.** Except for (a) Hazardous Materials contained in products used by Tenant in de minimis quantities for ordinary cleaning and office purposes, (b) propane used in Tenant's forklifts in the normal course of its business, and (c) Hazardous Materials contained in products stored and/or distributed during Tenant's normal course of business in their original, sealed, and unopened containers, Tenant shall not permit or cause any party to bring any Hazardous Materials upon the Premises or transport, store, use, generate, manufacture or release any Hazardous Material in or about the Premises without Landlord's prior written consent. The term "**Environmental Requirements**" means all applicable present and future statutes, regulations, ordinances, rules, codes, permits, judgments, orders or other similar enactments of any governmental authority or agency regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; and all state and local counterparts thereto, and any regulations or policies promulgated or issued thereunder. The term "**Hazardous Materials**" means and includes any substance, material, waste, pollutant, or contaminant listed or defined as hazardous or toxic, under any Environmental Requirements, asbestos and petroleum, including crude oil or any fraction thereof, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas). As defined in Environmental Requirements, Tenant is and shall be deemed to be the "**operator**" of Tenant's "**facility**" and the "**owner**" of all Hazardous Materials brought on the Premises by Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom. No cure or grace period provided in this Lease shall apply to Tenant's obligations to comply with the terms and conditions of this Section.

(2)　　**Duty to Inform Landlord.** If Tenant knows, or has reasonable cause to believe, that a Hazardous Material has come to be located in, on, under or about the Premises, other than as previously consented to by Landlord, Tenant shall immediately give written notice of such fact to Landlord, and provide Landlord with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Material.

(3)　　**Tenant Remediation.** Tenant, at its sole cost and expense, shall operate its business in the Premises in strict compliance with all Environmental Requirements and shall investigate, mitigate and remediate in a manner satisfactory to Landlord any Hazardous Materials introduced or released on or from the Project by Tenant, its agents, employees, contractors, subtenants or invitees during the Lease Term. Tenant shall complete and certify to disclosure statements as requested by Landlord from time to time relating to Tenant's transportation, storage, use, generation, manufacture




INITIALS

DocuSign Envelope ID: C7370A93-8350-4481-A02E-4DFB8FD92737
DocuSign Envelope ID: BD7274FC-D336-47C1-B69F-...

or release of Hazardous Materials on the Project.

(4)    **Tenant Indemnification for Hazardous Materials and Limitation of Liability.** Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses (including, without limitation, diminution in value of the Premises or the Project and loss of rental income from the Project), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation, removal or management of any asbestos brought into the property or disturbed in breach of the requirements of this Section, regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials for which Tenant is obligated to remediate as provided above or any other breach of the requirements under this Section by Tenant, its agents, employees, contractors, subtenants, assignees or invitees, regardless of whether Tenant had knowledge of such noncompliance. The obligations of Tenant under this Section shall survive any termination of this Lease. Notwithstanding anything to the contrary in this subsection, Tenant shall have no liability of any kind to Landlord as to Hazardous Materials on the Premises (i) caused by (a) Landlord or its agents, or (b) any other tenants in the Project or their agents, employees, contractors, subtenants, assignees or invitees; or (ii) present at the Premises prior to the date Tenant takes occupancy of the Premises, unless disturbed by Tenant in violation of this Lease.

(5)    **Investigations and Remediation.** Landlord shall have access to, and a right to perform inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Section, or the environmental condition of the Premises. Access shall be granted to Landlord upon Landlord's prior notice to Tenant and at such times so as to minimize, so far as may be reasonable under the circumstances, any disturbance to Tenant's operations. Such inspections and tests shall be conducted at Landlord's expense, unless such inspections or tests reveal that Tenant has not complied with any Environmental Requirement, in which case Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests. Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights that Landlord holds against Tenant. In addition, Tenant shall provide to Landlord copies of all material safety data sheets (MSDS) for Hazardous Materials used, handled, stored or generated at the Premises prior to the Commencement Date, with regular updates if and when necessary to reflect current use, handling, storage or generation.

(6)    **Landlord Termination Option.** If a condition involving the presence of, or a contamination by, a Hazardous Material at the Premises that requires remediation (a "**Hazardous Material Condition**") occurs or is discovered during the Lease Term and is not Tenant's responsibility under this Lease or the Legal Requirements (in which case Tenant shall make the investigation and remediation thereof required by this Lease and/or the Legal Requirements and this Lease shall continue in full force and effect, but subject to Landlord's rights under Section 6.B(4) and Section 9), and if Landlord elects to remediate such condition and the estimated cost therefor exceeds 12 times the then monthly Base Rent of $100,000, whichever is less, Landlord may, at Landlord's sole discretion, give written notice to Tenant of Landlord's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Landlord elects to give a termination notice, Tenant may, within 10 days thereafter, give written notice to Landlord of Tenant's commitment to pay the amount by which the cost of the remediation of such Hazardous Material Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is less. Tenant shall provide Landlord with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Landlord shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Tenant does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Landlord's notice of termination.

C.    **Tenant's Compliance with Legal Requirements.** Except as otherwise provided in this Lease, Tenant shall, at Tenant's sole expense and regardless of the cost therefor or the time remaining on the Lease Term, fully, diligently and in a timely manner, materially comply with all Legal Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Landlord's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said Legal Requirements are now in effect or become effective after the date of this Lease. Tenant shall, within 10 days after receipt of Landlord's written request, provide Landlord with copies of all permits, licenses (including but not limited to a valid business license) and other documents, and other information evidencing Tenant's compliance with any Legal Requirements specified by Landlord, and shall immediately upon receipt, notify Landlord in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Tenant or the Premises to comply with any Legal Requirements. Likewise, Tenant shall immediately give written notice to Landlord of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.

D.    **Inspection; Compliance.** Landlord and Landlord's "**Lender**" (as defined in Section 29) and consultants shall have the right to enter into the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Tenant with this Lease. The cost of any such inspections shall be paid by Landlord, unless a violation of Legal Requirements or Environmental Requirements is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Tenant upon request reimburse Landlord for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination.

7.    **Maintenance; Repairs; Trade Fixtures and Tenant-Made Alterations.**

A.    **Tenant's Obligations.**

(1)    **In General.** Subject to the provisions of Sections 2.B. (Condition), 2.C. (Compliance), 6.C. (Tenant's Compliance with Legal Requirements), 7.B. (Landlord's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Tenant shall, at Tenant's sole expense, keep the Premises and Tenant-Made Alterations in good order, condition and repair including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fixtures, interior walls, interior surfaces of exterior walls, ceilings, floors, windows, doors, plate glass, loading doors and skylights but excluding any items which are the responsibility of Landlord pursuant to Section 7.B. Tenant, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts below. Tenant's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.

(2)    **Service Contracts.** Tenant shall, at Tenant's sole expense, procure and maintain contracts, with copies to Landlord, in customary form and substance for HVAC equipment, boiler and pressure vessels, clarifiers, janitorial and trash removal services, and with qualified and experienced contractors. However, Landlord reserves the right, upon notice to Tenant, to procure and maintain any or all of such service contracts, and Tenant shall reimburse Landlord, upon demand, for the cost thereof. The contract for HVAC maintenance shall be performed by a licensed and qualified HVAC contractor, and a copy of the contract must be provided to Landlord upon occupancy of the Premises. The service contract must become effective within 30 days of occupancy, and service visits shall be performed on a quarterly basis.

(3)    **Failure to Perform.** If Tenant fails to perform Tenant's obligations under this Section, Landlord may enter upon the Premises after 10 days' prior written notice to Tenant (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Tenant's behalf, and put the Premises in good order, condition and repair, and Tenant shall promptly pay to Landlord a sum equal to 115% of the cost thereof.

B.    **Landlord's Obligations.** Subject to the provisions of Sections 2.A. (Condition), 2.C. (Compliance), 4.B. (Operating Expenses), 6 (Use), 7.A. (Tenant's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Landlord shall, subject to reimbursement pursuant to Section 4.B., keep in good order, condition and repair the foundations, structural elements of the exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system (excluding fire sprinkler systems, if any, installed by or on behalf of Tenant, for which Tenant shall be responsible), Common Area fire alarm and/or smoke detection systems, fire hydrants, parking lots, walkways, parkways, driveways, landscaping, fences, signs and utility systems serving the Common Areas and all parts thereof. Landlord shall not be obligated to paint the exterior or interior surfaces of exterior walls nor shall Landlord be obligated to maintain, repair or replace windows, doors or plate glass of the Premises. Tenant expressly waives the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease, including, without limitation, California Civil Code Sections 1941 and 1942, and any other statute providing a right to make repairs and deduct the cost thereof from the rent.

C.    **Tenant-Made Alterations; Trade Fixtures.** Any alterations, additions, or improvements made by or on behalf of Tenant to the Premises ("**Tenant-Made Alterations**"), which are interior, non-structural Tenant-Made Alterations shall be subject to Landlord's prior written consent, not to be unreasonably withheld, delayed or conditioned provided that such alteration does not materially affect the structure or the roof of the Building, modify the exterior of the Building, or modify the utility or mechanical systems of the Project. Tenant shall have the right to perform interior, non-structural Tenant-Made Alterations which cost less than $5,000 per Alteration without obtaining Landlord's prior written consent, by providing a written notice of such Tenant-Made Alterations to Landlord containing sufficient and complete information regarding such Tenant-Made Alterations, provided that such alteration

Page 5 of 17



INITIALS

does not materially affect the structure or the roof of the Building, modify the exterior of the Building, or modify the utility or mechanical systems of the Building. Tenant shall not perform structural Tenant-Made Alterations to comply with insurance requirements without Landlord's prior written consent, which consent may be withheld in Landlord's sole and absolute discretion. Tenant shall give Landlord not less than 10 days' notice prior to the commencement of any work in, on or about the Premises. Tenant shall cause, at its expense, all Tenant-Made Alterations to comply with insurance requirements and with Legal Requirements and shall construct at its expense any alteration or modification required by Legal Requirements as a result of any Tenant-Made Alterations. All Tenant-Made Alterations shall be constructed in a good and workmanlike manner by contractors reasonably acceptable to Landlord and only good grades of materials shall be used. All plans and specifications for any Tenant-Made Alterations shall be submitted to Landlord for its approval. Landlord may monitor construction of the Tenant-Made Alterations. Tenant shall reimburse Landlord for its costs in reviewing plans and specifications and in monitoring construction. Landlord's right to review plans and specifications and to monitor construction shall be solely for its own benefit, and Landlord shall have no duty to see that such plans and specifications or construction comply with applicable laws, codes, rules and regulations. Tenant shall provide Landlord with the identities and mailing addresses of all persons performing work or supplying materials, prior to beginning such construction, and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable Legal Requirements. Tenant shall furnish security or make other arrangements satisfactory to Landlord to assure payment for the completion of all work free and clear of liens and shall provide certificates of insurance for worker's compensation and other coverage in amounts and from an insurance company satisfactory to Landlord protecting Landlord against liability for personal injury or property damage during construction. For work which costs an amount in excess of one month's Base Rent, Landlord may condition its consent upon Tenant providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Tenant-Made Alteration and/or upon Tenant's posting an additional Security Deposit with Landlord. Upon completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord sworn statements setting forth the names of all contractors and subcontractors who did work on the Tenant-Made Alterations and final lien waivers from all such contractors and subcontractors. Upon surrender of the Premises, all Tenant-Made Alterations and any leasehold improvements constructed by Landlord or Tenant shall remain on the Premises as Landlord's property, except to the extent Landlord requires removal at Tenant's expense of any such items or Landlord and Tenant have otherwise agreed in writing in connection with Landlord's consent to any Tenant-Made Alterations. Tenant shall repair any damage caused by the removal of such Tenant-Made Alterations upon surrender of the Premises. Tenant, at its own cost and expense and without Landlord's prior approval, may erect such shelves, racking, bins, machinery and trade fixtures (collectively "**Trade Fixtures**") in the ordinary course of its business provided that such items do not alter the basic character of the Premises, do not overload or damage the Premises, and may be removed without injury to the Premises, and the construction, erection, and installation thereof complies with all Legal Requirements and with Landlord's requirements set forth above. Tenant shall remove its Trade Fixtures and shall repair any damage caused by such removal upon surrender of the Premises.

(1)    **Liens; Bonds**. Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises and that it will save and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the interest of Landlord in the Premises or under this Lease. Tenant shall give Landlord immediate written notice of the placing of any lien or encumbrance against the Premises and cause such lien or encumbrance to be discharged within 20 days of the filing or recording thereof, provided, however, Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured over in a manner satisfactory to Landlord within 20 day period.

(2)    **Surrender; Restoration**. Upon termination of the Lease Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received (with all Tenant-Made Alterations (including, without limitation, any initial Tenant-Made Alterations), improvements and Trade Fixtures removed except as otherwise expressly agreed in writing by Landlord) ordinary wear and tear, casualty loss and condemnation covered by Sections 9 and 14 excepted and otherwise in accordance with this Section. Without limiting the foregoing, Tenant shall remove any odor which may exist in the Premises resulting from Tenant's occupancy of the Premises upon the termination of the Lease Term or earlier termination of Tenant's right of possession. Any Trade Fixtures, Tenant-Made Alterations and property not so removed by Tenant as permitted or required herein shall be deemed abandoned and may be stored, removed, and disposed of by Landlord at Tenant's expense, and Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and disposition of such property. All obligations of Tenant hereunder not fully performed as of the termination of the Lease Term shall survive the termination of the Lease Term, including without limitation, indemnity obligations, payment obligations with respect to Operating Expenses and all obligations concerning the condition and repair of the Premises. Without limiting Tenant's obligations under the Lease, Tenant acknowledges that it shall have the affirmative obligation to remove all racking and floor striping from the Premises by or before the expiration or earlier termination of the Lease Term. As guidance to the parties, removal of the aforementioned racking shall include, without limitation, removal of the bolts in concrete associated therewith, all of which cut flush at the surface and pushed into the concrete one inch or more below the slab. Tenant shall clean all resulting holes and shall fill the same with epoxy flush to the floor's surface. Tenant understands that the holes created for any anchor bolts placed by or on behalf of Tenant must be drilled one inch deeper than the length of the anchor bolts themselves to permit removal in the manner provided above. Furthermore, if Tenant places (or causes to be placed) any floor striping in the Premises, then following removal of any such floor striping (i) there shall be no residual staining or other indication that such striping existed and (ii) Tenant must re-seal the floor with a sealant reasonably acceptable to Landlord. If Tenant elects to stripe the floor of the Premises, then Tenant shall utilize a floor striping material which can be removed and which will not permeate into the flooring. The foregoing does not constitute Landlord's consent to Tenant's placement of any racking and/or floor striping in the Premises, which placement shall be governed by the provision of the Lease. Additionally, without limiting Tenant's obligations under the Lease, Tenant acknowledges that it shall have the affirmative obligation to cause all office, warehouse, emergency and exit lights to be fully operational with all bulbs and ballasts functioning; all truck doors, service doors, roll up doors and dock levelers serviced and placed in good operating order (including replacement of any dented truck door panels and adjustment of door tension to insure proper operation, with all door panels that have been replaced painted to match the building standard); dock seals/dock bumpers to be free of tears and broken backboards; all structural steel columns in the warehouse and office to be inspected for damage, with repairs of this nature pre-approved by Landlord prior to implementation; sheetrock (drywall) damage to be patched and fire-taped so that there are no holes in either office or warehouse; walls, carpet and vinyl tiles to be in a clean condition without any holes or chips in them (Landlord will accept normal wear on these items provided they appear to be in a maintained condition); any Tenant-installed equipment to be removed from the roof and roof penetrations properly repaired by licensed roofing contractor approved by Landlord; all exterior signs to be removed and holes patched and paint touched-up as necessary; HVAC systems to be placed in good working order, including the necessary replacement of any parts to return the unit to a well maintained condition; and all electrical and plumbing equipment to be returned in good condition and repair and conforming to code.

8.    **Insurance; Indemnity**.

A.    **Landlord's Insurance**. Landlord shall maintain all risk or special form property insurance covering the full replacement cost of the Building, or the amount required by any Lender (as defined in Section 29), and commercial general liability insurance on the Project and rent loss insurance for one year with an extended period of indemnity for an additional 180 days, all in forms and amounts customary for properties substantially similar to the Project, subject to customary deductibles. If available and commercially appropriate such property insurance policy or policies shall insure against all risks of direct physical loss or damage, including coverage for debris removal and the enforcement of any Legal Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary, including, but not limited to earthquake insurance. All such insurance costs shall be included as part of the Operating Expenses charged to Tenant. The Project or Building may be included in a blanket policy (in which case the cost of such insurance allocable to the Project or Building will be determined by Landlord based upon the total insurance cost calculations). Tenant shall also reimburse Landlord for any increased premiums or additional insurance which Landlord reasonably deems necessary as a result of Tenant's use of the Premises. Tenant shall not be named as an additional insured in such policies. Landlord shall not be required to insure Tenant's improvements, property, Trade Fixtures or Tenant-Made Alterations.

B.    **Tenant's Insurance**. Tenant, at its expense, shall maintain during the Lease Term the following insurance, at Tenant's sole cost and expense: (1) commercial general liability insurance (and, if necessary, commercial excess liability insurance) applicable to the Premises and its appurtenances providing a minimum combined single limit of not less than $2,000,000 per occurrence with an annual aggregate of not less than $2,000,000; and if Tenant stores property of others for a fee, Tenant shall maintain warehouse operator's legal liability insurance for the full value of the property of such customers as determined by the warehouse contract between Tenant and its customer; (2) all risk or special form property insurance covering the full replacement cost of all property, Tenant-Made Alterations, Trade Fixtures, and improvements installed or placed in the Premises by Tenant with a deductible not to exceed $1,000 per occurrence (unless otherwise agreed in writing by Landlord); (3) business interruption insurance with a limit of liability representing loss of at least approximately 6 months of income; (4) workers' compensation insurance as required by the state in which the Premises is located and in amounts as may be required by applicable statute; (5) employers liability insurance of at least $1,000,000; and (6) business automobile liability insurance (and, if necessary, commercial excess liability insurance) having a combined single limit of not less than $2,000,000 per accident insuring Tenant against liability arising out of the ownership maintenance or use of any owned, hired or nonowned automobiles. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. Any company writing any of Tenant's insurance

Page 6 of 17

INITIALS

DocuSign Envelope ID: BD7274FC-D336-47C1-B804-4DB78FD92737

shall have an A.M. Best rating of not less than A-VII and the general liability policy shall be endorsed to provide primary and noncontributory coverage to Landlord (any policy issued to Landlord providing duplicate or similar coverage shall be deemed excess over Tenant's policies). All commercial general liability and, if applicable, warehouse operator's legal liability insurance policies shall name Tenant as a named insured and Landlord, its property manager, and other designees of Landlord as the interest of such designees shall appear, as additional insureds. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include (a) a waiver of subrogation endorsement and (b) coverage for liability assumed under this Lease as an "insured contract" for the performance of Tenant's indemnity obligations under this Lease. If the general liability insurance contains a general aggregate limit, it shall apply separately to this Premises. The limits and types of insurance maintained by Tenant shall not limit Tenant's liability under this Lease. Tenant shall provide Landlord with certificates of such insurance (including copies of all required endorsements) as required under this Lease prior to the earlier to occur of the Commencement Date or the date Tenant is provided with possession of the Premises, and thereafter upon renewals at least 10 days prior to the expiration of the insurance coverage. Acceptance by Landlord of delivery of any certificates of insurance does not constitute approval or agreement by Landlord that the insurance requirements of this section have been met, and failure of Landlord to identify a deficiency from evidence provided will not be construed as a waiver of Tenant's obligation to maintain such insurance. In the event any of the insurance policies required to be carried by Tenant under this Lease shall be cancelled prior to the expiration date of such policy, or if Tenant receives notice of any cancellation of such insurance policies from the insurer prior to the expiration date of such policy, Tenant shall: (a) immediately deliver notice to Landlord that such insurance has been, or is to be, cancelled, (b) shall promptly replace such insurance policy in order to assure no lapse of coverage shall occur, and (c) shall deliver to Landlord a certificate of insurance (including copies of all required endorsements) for such replacement policy. The insurance required to be maintained by Tenant hereunder are only Landlord's minimum insurance requirements and Tenant agrees and understands that such insurance requirements may not be sufficient to fully meet Tenant's insurance needs.

C.    **Waiver of Subrogation.** Without affecting any other rights or remedies, Tenant and Landlord each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto (except as otherwise expressly set forth in this Lease). The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Landlord or Tenant, as the case may be, so long as the insurance is not invalidated thereby.

D.    **Indemnity.** Except to the extent of Landlord's gross negligence or willful misconduct, Tenant shall indemnify, protect, defend and hold harmless the Premises, Landlord and its agents, Landlord's master or ground Landlord, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Tenant. If any action or proceeding is brought against Landlord by reason of any of the foregoing matters, Tenant shall upon notice defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord and Landlord shall cooperate with Tenant in such defense. Landlord need not have first paid any such claim in order to be defended or indemnified.

E.    **Exemption of Landlord and its Agents from Liability.** Notwithstanding the negligence (including, without limitation, gross negligence) or breach of this Lease by Landlord or its agents, neither Landlord nor its agents shall be liable under any circumstances (pursuant to any legal or equitable remedy) for: (i) injury or damage to the person or goods, wares, merchandise or other property of Tenant, Tenant's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Landlord or from the failure of Landlord or its agents to enforce the provisions of any other lease in the Project, (iii) injury to Tenant's business or for any loss of income or profit therefrom, or (iv) consequential or punitive damages. Instead, it is intended that Tenant's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Tenant is required to maintain pursuant to the provisions of this Section.

F.    **Failure to Provide Insurance.** Tenant acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Landlord to risks and potentially cause Landlord to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. If Tenant shall fail to procure and maintain the insurance required to be carried by it, Landlord may, but shall not be required to, procure and maintain the same, and Tenant shall promptly pay to Landlord a sum equal to 115% of the cost thereof.

G.    **Insurance for Vendors.** All vendors, movers and contractors engaged by or on behalf of Tenant to perform work in or about the Premises shall deliver proof of insurance to Landlord before said person or entity will be permitted to commence work, which insurance must name Landlord as an additional insured thereunder and be otherwise reasonably acceptable to Landlord.

9.    **Damage or Destruction.**

A.    **Restoration.** If at any time during the Lease Term the Premises are damaged by a fire or other casualty covered by insurance carried by Landlord, Landlord shall notify Tenant within 60 days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises. If the restoration time is estimated to exceed 12 months from the casualty date or if Landlord is unable to obtain the necessary permits for restoration within 6 months from the casualty date (a "**Premises Total Destruction**"), either Landlord or Tenant may elect to terminate this Lease upon notice to the other party given no later than 30 days after Landlord's notice; provided, however, if the damage or destruction was caused by the gross negligence or willful misconduct of Tenant, Landlord shall have the right to recover Landlord's damages from Tenant, except as provided in Section 8.C., and Tenant shall have no right to terminate this Lease. If neither party elects to terminate this Lease or if Landlord estimates that restoration will take 12 months or less, then, subject to receipt of sufficient insurance proceeds, Landlord shall diligently pursue the necessary permits and promptly restore the Premises excluding Trade Fixtures and the improvements installed by Tenant or by Landlord and paid by Tenant, subject to delays arising from the collection of insurance proceeds or from Force Majeure events (as defined in Section 48). Tenant at Tenant's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from Force Majeure events, all repairs or restoration not required to be done by Landlord and shall promptly re-enter the Premises and commence doing business in accordance with this Lease. Notwithstanding the foregoing, either party may terminate this Lease if the Premises are damaged during the last 6 months of the Lease Term and Landlord reasonably estimates that it will take more than one month to repair such damage. Notwithstanding the foregoing, if Tenant at that time has an exercisable option to extend this Lease, then Tenant may preserve this Lease by exercising such option and providing Landlord with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs within 10 days after Tenant's receipt of Landlord's written notice purporting to terminate this Lease. Base Rent and Operating Expenses shall be abated for the period of repair and restoration of an insured casualty commencing on the date of such casualty event in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises. Such abatement shall be the sole remedy of Tenant, and except as provided herein, Tenant waives any right to terminate the Lease by reason of damage or casualty loss, including without limitation those available under California Civil Code Sections 1932 and 1933(4). Notwithstanding anything contained in the Lease to the contrary, to the extent the damage to the Project is attributable to Tenant, Tenant shall pay to Landlord with respect to any damage to the Project an amount of the commercially reasonable deductible under Landlord's insurance policy, not to exceed $10,000.00, within 30 days after presentment of Landlord's invoice.

B.    **Partial Damage - Uninsured Loss.** If at any time during the Lease Term the Premises are damaged by a casualty that is not covered by insurance and/or Landlord and Landlord estimates that the restoration time is estimated to be 12 months or less from the casualty date ("**Premises Partial Damage**"), unless caused by a negligent or willful act of Tenant (in which event Tenant shall make the repairs at Tenant's expense), Landlord may either: (i) repair such damage as soon as reasonably possible at Landlord's expense (subject to reimbursement pursuant to the Operating Expenses provisions), in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Tenant within 30 days after receipt by Landlord of knowledge of the occurrence of such uninsured Premises Partial Damage. Such termination shall be effective 60 days following the date of such notice. In the event Landlord elects to terminate this Lease, Tenant shall have the right within 10 days after receipt of the termination notice to give written notice to Landlord of Tenant's commitment to pay for the repair of such damage without reimbursement from Landlord. Tenant shall provide Landlord with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Landlord shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Tenant does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice. Premises Partial Damage due to flood or earthquake shall be subject to this subsection, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Landlord or Tenant.

10.    **Real Property Taxes.**

A.    **Real Property Taxes.** As used herein, the term "**Real Property Taxes**" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Landlord in the Project, Landlord's right to other income therefrom, and/or Landlord's

INITIALS

business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address. The term **"Real Property Taxes"** shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project, (ii) a change in the improvements thereon, and/or (iii) levied or assessed on machinery or equipment provided by Landlord to Tenant pursuant to this Lease.

B.        **Payment of Taxes.** Except as otherwise provided in Section 10.C., Landlord shall pay the Real Property Taxes applicable to the Project, and said payments shall be included in the calculation of Operating Expenses in accordance with the provisions of Section 4.B.

C.        **Additional Improvements.** Operating Expenses shall not include Real Property Taxes specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Project by other tenants or by Landlord for the exclusive enjoyment of such other tenants. Notwithstanding Section 10.B. hereof, Tenant shall, however, pay to Landlord at the time Operating Expenses are payable under Section 4.B., the entirety of any increase in Real Property Taxes if assessed solely by reason of Tenant-Made Alterations, Trade Fixtures placed upon the Premises by Tenant or at Tenant's request or by reason of any alterations or improvements to the Premises made by Landlord subsequent to the execution of this Lease by the Parties.

D.        **Joint Assessment.** If the Building is not separately assessed, Real Property Taxes allocated to the Building shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Landlord from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.  Landlord's reasonable determination thereof shall be conclusive.

E.        **Personal Property Taxes.** Tenant shall pay prior to delinquency all taxes assessed against and levied upon Tenant-Made Alterations, Trade Fixtures, furnishings, equipment and all personal property of Tenant contained in the Premises. When possible, Tenant shall cause its Tenant-Made Alterations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Landlord. If any of Tenant's said property shall be assessed with Landlord's real property, Tenant shall pay Landlord the taxes attributable to Tenant's property within 10 days after receipt of a written statement setting forth the taxes applicable to Tenant's property.

11.        **Utilities, Services and Trash.**  Tenant shall pay for all water, gas, electricity, heat, light, power, telephone, sewer, sprinkler services, and other utilities and services used on the Premises, all maintenance and metering charges for utilities, and any storm sewer charges or other similar charges for utilities imposed by any governmental entity, utility provider or metering service, together with any taxes, penalties, surcharges or the like pertaining to Tenant's use of the Premises.  Tenant shall pay for refuse and trash collection services for the Premises if Landlord operates the Project in a manner such that tenants contract directly for trash collection services.  Landlord may cause at Tenant's expense any utilities to be separately metered or charged directly to Tenant by the provider in the event Landlord reasonably determines that Tenant's use of such jointly metered utility materially exceeds the use of such jointly metered utility by other tenants in the Building.  Tenant shall pay its share of all charges for jointly metered utilities based upon consumption, as reasonably determined by Landlord.  No interruption or failure of utilities shall result in the termination of this Lease or the abatement of rent. Tenant agrees to limit use of water and sewer for normal restroom use.  Tenant shall not use the trash bins of the Project other than for disposal of ordinary refuse. In no event shall Tenant use the bins for the disposal of large items, such as (but not limited to) carpet, packing crates, furniture, cardboard shipping boxes and storage pallets.

12.        **Assignment and Subletting.** Without Landlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall not assign this Lease or sublease the Premises or any part thereof or mortgage, pledge, or hypothecate its leasehold interest or grant any concession or license within the Premises and any attempt to do any of the foregoing shall be void and of no effect.  In order to be reasonable for the Landlord to withhold, delay or condition its consent, where required, to any assignment or sublease in any of the following instances: (i) the assignee or sublessee does not have a net worth calculated according to generally accepted accounting principles at least equal to the greater of the net worth of Tenant immediately prior to such assignment or sublease or the net worth of Tenant at the time it executed the Lease; (ii) occupancy of the Premises by the assignee or sublessee would, in Landlord's opinion, violate any agreement binding upon Landlord or the Project with regard to the identity of tenants, usage in the Project, or similar matters; (iii) the identity or business reputation of the assignee or sublessee will, in the good faith judgment of Landlord, tend to damage the goodwill or reputation of the Project, (iv) the assignment or sublease is to another tenant in the Project (or an affiliate thereof) and is at rates which are below those charged by Landlord for comparable space in the Project, or is to a prospective tenant that has been in discussions with Landlord regarding space within the Project; or (v) in the case of a sublease, the subtenant has not acknowledged that the Lease controls over any inconsistent provision in the sublease. The foregoing criteria shall not exclude any other reasonable basis for Landlord to refuse its consent to such assignment or sublease.  Any approved assignment or sublease shall be expressly subject to the terms and conditions of this Lease.  Tenant shall provide to Landlord all information concerning the assignee or sublease as Landlord may reasonably request.  Landlord may revoke its consent immediately and without notice if, as of the effective date of the assignment or sublease, there has occurred and is continuing any default under the Lease.  For purposes of this Section, a transfer of the ownership interests controlling Tenant shall be deemed an assignment of this Lease unless such ownership interests are publicly traded. Notwithstanding the above, Tenant may assign or sublet the Premises, or any part thereof, to any entity controlling Tenant, controlled by Tenant or under common control with Tenant (a **"Tenant Affiliate"**), without the prior written consent of Landlord.  Tenant shall reimburse Landlord for all of Landlord's reasonable expenses in connection with any assignment or sublease not to exceed $3,000.00.  This Lease shall be binding upon Tenant and its successors and permitted assigns. Upon Landlord's receipt of Tenant's written notice of a desire to assign or sublet the Premises, or any part thereof (other than to a Tenant Affiliate), Landlord may, by giving written notice to Tenant within 30 days after receipt of Tenant's notice, terminate this Lease with respect to the space described in Tenant's notice, as of the date specified in Tenant's notice for the commencement of the proposed assignment or sublease.  Notwithstanding any assignment or subletting, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent and for compliance with all of Tenant's other obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such assignments or sublettings). If Landlord consents to any assignment or subletting of Tenant's interest in this Lease, as a condition thereto which the parties hereby agree is reasonable, Tenant shall pay to Landlord fifty percent (50%) of all rent, additional rent or other consideration (including, without limitation, key money or other cash consideration if applicable) payable by such assignee or sublessee in connection with an assignment or subletting in excess of the Base Rent and Operating Expenses payable by Tenant under this Lease during the term of the applicable assignment or subletting on a per rentable area square foot basis if less than all of the Premises is transferred (unless all or a portion of the subject space is subject to different Base Rent and Operating Expenses terms, in which case, to the extent applicable, such different terms shall be applicable), after deducting the reasonable brokerage and improvement costs  (including improvement allowances) payable to third parties as necessary to conclude the applicable assignment or subletting. If this Lease be assigned or if the Premises be subleased (whether in whole or in part) or in the event of the mortgage, pledge, or hypothecation of Tenant's leasehold interest or grant of any concession or license within the Premises or if the Premises be occupied in whole or in part by anyone other than Tenant, then upon a default by Tenant hereunder Landlord may collect rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and, except to the extent otherwise set forth herein, apply the amount collected to the next rent payable hereunder; and all such rentals collected by Tenant shall be held in trust for Landlord and immediately forwarded to Landlord.  No such transaction or collection of rent or application thereof by Landlord, however, shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties, or obligations hereunder.  Tenant hereby waives and releases its rights under Section 1995.310 of the California Civil Code or under any similar law, statute or ordinance now or hereafter in effect.

If Tenant shall be subjected to the provisions of the United States Bankruptcy Code or other law of the United States or any state thereof for the protection of debtors as in effect at such time (each a **"Debtor's Law"**) Tenant, Tenant as debtor-in-possession, and any trustee or receiver of Tenant's assets (each a **"Tenant's Representative"**) shall have no greater right to assume or assign this Lease or any interest in this Lease, or to sublease any of the Premises than accorded to Tenant this Section of the Lease, except to the extent Landlord shall be required to permit such assumption, assignment or sublease by the provisions of such Debtor's Law.  In such case, Tenant's Representative shall (a) remain subject to all of the terms and requirements of this Section; (b) shall have deposited with Landlord as security for the timely payment of rent an amount equal to the larger of: (1) three (3) months' Rent and other monetary charges accruing under this Lease; and (2) any sum specified in Section 1 (Basic Lease Provisions) of this Lease; and (c) shall have provided Landlord with adequate other assurance of the future performance of the obligations of Tenant under this Lease.  In the event that an attorney is employed or expenses are incurred to pursue, protect, enforce or litigate the obligations hereunder, whether by suit, action or other proceeding, Tenant's Representative promises to pay all such expenses and reasonable attorneys' fees, including, without limitation, reasonable attorneys' fees incurred in or with respect to any bankruptcy proceeding.

INITIALS

DocuSign Envelope ID: C732CA93-83E9-4095-4DBF-D93737

DocuSign Envelope ID: BD7274FC-D336-47C1-BB

13. **Events of Default; Remedies.**

A. **Event of Default:** Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

(1) Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due, and such failure shall continue for a period of 5 days from the date such payment was due.

(2) Tenant or any guarantor or surety of Tenant's obligations hereunder shall (A) make a general assignment for the benefit of creditors; (B) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a **"proceeding for relief"**); (C) become the subject of any proceeding for relief which is not dismissed within 60 days of its filing or entry; or (D) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

(3) Any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease.

(4) Tenant shall cease to occupy or shall vacate the Premises whether or not Tenant is in monetary or other default under this Lease. Tenant's vacating of the Premises shall not constitute an Event of Default if, prior to vacating the Premises, Tenant has made arrangements reasonably acceptable to Landlord to:

(a) ensure that Tenant's insurance for the Premises will not be voided or cancelled with respect to the Premises as a result of such vacancy,

(b) ensure that the Premises are secured and not subject to vandalism, and

(c) ensure that the Premises will be properly maintained after such vacation, including, but not limited to, keeping the heating, ventilation and cooling systems maintenance contracts required by this Lease in full force and effect and maintaining the utility services. Tenant shall inspect the Premises at least once each month and report monthly in writing to Landlord on the condition of the Premises.

(5) Tenant shall attempt or there shall occur any assignment, subleasing or other transfer of Tenant's interest in or with respect to this Lease except as otherwise permitted in this Lease.

(6) Tenant shall fail to discharge any lien placed upon the Premises in violation of this Lease within 20 days after any such lien or encumbrance is filed against the Premises.

(7) Tenant shall fail to provide to Landlord (i) reasonable written evidence of compliance with Legal Requirements, (ii) the service contracts required under this Lease, (iii) an estoppel certificate or financial statements as required hereunder, (iv) a requested subordination, (v) evidence concerning any guaranty and/or Guarantor, (vi) any document requested under Paragraph 38 (Reservations), (vii) material data safety sheets (MSDS), or (viii) any other documentation or information which Landlord may reasonably require of Tenant under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Tenant.

(8) Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Section 13.A., and except as otherwise expressly provided herein, such default shall continue for more than 30 days after Landlord shall have given Tenant written notice of such default (said notice being in lieu of, and not in addition to, any notice required as a prerequisite to a forcible entry and detainer or similar action for possession of the Premises).

(9) Tenant shall be delinquent by more than 15 days in the payment of Rent on 3 separate occasions in any 12 month period, or Tenant or Tenant's employees, agents or representatives fail to comply with any of the rules and regulations for the Project more than 2 times in any 12 month period.

Tenant agrees that any notice given by Landlord pursuant to this Section of the Lease shall satisfy the requirements for notice under California Code of Civil Procedure Section 1161, and Landlord shall not be required to give any additional notice in order to be entitled to commence an unlawful detainer proceeding..

B. **Remedies.** Upon each occurrence of an Event of Default and so long as such Event of Default shall be continuing, Landlord may at any time thereafter at its election: terminate this Lease or Tenant's right of possession (but Tenant shall remain liable as hereinafter provided); and/or pursue any other remedies at law or in equity. Upon the termination of this Lease or termination of Tenant's right of possession, it shall be lawful for Landlord, without formal demand or notice of any kind, to re-enter the Premises by summary dispossession proceedings or any other action or proceeding authorized by law and to remove Tenant and all persons and property therefrom. If Landlord re-enters the Premises, Landlord shall have the right to keep in place and use, or remove and store, all of the furniture, fixtures and equipment at the Premises. Except as otherwise provided in the next paragraph, if Tenant breaches this Lease and abandoned the Premises prior to the end of the term hereof, or if Tenant's right to possession is terminated by Landlord because of an Event of Default by Tenant under this Lease, this Lease shall terminate. Upon such termination, Landlord may recover from Tenant the following, as provided in Section 1951.2 of the Civil Code of California: (i) the worth at the time of award of the unpaid Base Rent and other charges under this Lease that had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the reasonable value of the unpaid Base Rent and other charges under this Lease which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; (iii) the worth at the time of award by which the reasonable value of the unpaid Base Rent and other charges under this Lease for the balance of the term of this Lease after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; and (iv) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or that in the ordinary course of things would be likely to result therefrom. As used herein, the following terms are defined:

(1) The "worth at the time of award" of the amounts referred to in clauses (i) and (ii) above is computed by allowing interest at the lesser of 18 percent per annum or the maximum lawful rate. The "worth at the time of award" of the amount referred to in clause (iii) above is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent;

(2) The "time of award" as used in clauses (i), (ii), and (iii) above is the date on which judgment is entered by a court of competent jurisdiction;

(3) The "reasonable value" of the amount referred to in clause (ii) above is computed by determining the mathematical product of (i) the "reasonable annual rental value" (as defined herein) and (ii) the number of years, including fractional parts thereof, between the date of termination and the time of award. The "reasonable value" of the amount referred to in clause (iii) above is computed by determining the mathematical product of (1) the annual Base Rent and other charges under this Lease and (2) the number of years including fractional parts thereof remaining in the balance of the term of this Lease after the time of award. Tenant acknowledges and agrees that the term "detriment proximately caused by Tenant's failure to perform its obligations under this Lease" includes, without limitation, the value of any abated or free rent given to Tenant. Even though Tenant has breached this Lease and abandoned the Premises, this Lease shall continue in effect for so long as Landlord does not terminate Tenant's right to possession, and Landlord may enforce all its rights and remedies under this Lease, including the right to recover rent as it becomes due. This remedy is intended to be the remedy described in California Civil Code Section 1951.4, and the following provision from such Civil Code Section is hereby repeated: "The Lessor has the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has right to sublet or assign subject only to reasonable limitations)." Any such payments due Landlord shall be made upon demand therefor from time to time and Tenant agrees that Landlord may file suit to recover any sums falling due from time to time. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous breach. Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises and/or a termination of this Lease by Landlord, whether by agreement or by operation of law, it being understood that such surrender and/or termination can be effected only by the written agreement of Landlord and Tenant. Any law, usage, or custom to the contrary notwithstanding, Landlord shall have the right at all times to enforce the provisions of this Lease in strict accordance with the terms hereof; and the failure of Landlord at any time to enforce its rights under this Lease strictly in accordance with same shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions, and covenants of this Lease or as having modified the same. Tenant and Landlord further agree that forbearance or waiver by Landlord to enforce its rights pursuant to this Lease or at law or in equity, shall not be a waiver of Landlord's right to enforce one or more of its rights in connection

Page 9 of 17

_14_

RC

INITIALS

Case 2:20-bk-10181-VZ    Doc 37    Filed 01/30/20    Entered 01/30/20 12:08:08    Desc
Main Document    Page 65 of 77

DocuSign Envelope ID: C732DA9385E0481A97F54DB8FD92737
DocuSign Envelope ID: BD7274FC-D336-47C1-B1B4-...

with any subsequent default. A receipt by Landlord of rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. To the greatest extent permitted by law, Tenant waives the service of notice of Landlord's intention to re-enter as provided for in any statute, or to institute legal proceedings to that end, and also waives all right of redemption in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge. The terms "enter," "re-enter," "entry" or "re-entry," as used in this Lease, are not restricted to their technical legal meanings. Any reletting of the Premises shall be on such terms and conditions as Landlord in its sole discretion may determine (including without limitation a term different than the remaining Lease Term, rental concessions, alterations and repair of the Premises, lease of less than the entire Premises to any tenant and leasing any or all other portions of the Project before reletting the Premises). Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting.

C.    **Interest.** Any amount not paid by Tenant within 5 days after its due date in accordance with the terms of this Lease, regardless of whether an Event of Default exists, shall bear interest from such due date until paid in full at the lesser of the highest rate permitted by applicable law or fifteen percent (15%) per year. It is expressly the intent of Landlord and Tenant at all times to comply with applicable law governing the maximum rate or amount of any interest payable on or in connection with this Lease. If applicable law is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

D.    **Breach by Landlord.** Landlord shall not be in default hereunder unless Landlord fails to perform any of its obligations hereunder within 30 days after written notice from Tenant specifying such failure (unless such performance will, due to the nature of the obligation, require a period of time in excess of 30 days, then after such period of time as is reasonably necessary). All obligations of Landlord hereunder shall be construed as covenants, not conditions; and, except as may be otherwise expressly provided in this Lease, Tenant may not terminate this Lease or offset any Rent due under this Lease for breach of Landlord's obligations hereunder.

14.    **Condemnation.** If any part of the Premises or the Project should be taken for any public or quasi public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and the Taking would materially interfere with or impair Landlord's ownership or operation of the Project, then upon written notice by Landlord this Lease shall terminate and Base Rent shall be apportioned as of said date. If part of the Premises shall be Taken, and this Lease is not terminated as provided above, the Base Rent payable hereunder during the unexpired Lease Term shall be reduced to such extent as may be fair and reasonable under the circumstances. In the event of any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's Trade Fixtures, if a separate award for such items is made to Tenant.

15.    **Brokerage Fees.** Tenant and Landlord each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any, set forth in the Basic Lease Provisions) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection with this leasing transaction. Tenant and Landlord do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

16.    **Estoppel Certificates; Financial Statements.**

A.    Tenant agrees, from time to time, within 10 days after request of Landlord, to execute and deliver to Landlord, or Landlord's designee, any estoppel certificate requested by Landlord, stating that this Lease is in full force and effect, the date to which rent has been paid, that Landlord is not in default hereunder (or specifying in detail the nature of Landlord's default), the termination date of this Lease and such other matters pertaining to this Lease as may be requested by Landlord. Tenant's obligation to furnish each estoppel certificate in a timely fashion is a material inducement for Landlord's execution of this Lease. No cure or grace period provided in this Lease shall apply to Tenant's obligations to timely deliver an estoppel certificate.

B.    If Landlord desires to finance, refinance, or sell the Premises, or any part thereof, or if there is an Event of Default, or if Tenant requests permission to assign the Lease, or if Tenant exercises any renewal/extension option hereunder, Tenant and all Guarantors shall within 10 days after written notice from Landlord deliver to Landlord, any potential lender or purchaser designated by Landlord if applicable, such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Tenant's financial statements for the past 3 years. All such financial statements shall be received by Landlord and any such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.    **Definition of Landlord.** The term "**Landlord**" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the tenant's interest in the prior lease. In the event of a transfer of Landlord's title or interest in the Premises or this Lease, Landlord shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Landlord. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Landlord shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Landlord. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Landlord shall be binding only upon the Landlord as hereinabove defined.

18.    **Severability.** If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby. It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

19.    **Days.** Unless otherwise specifically indicated to the contrary, the word "**days**" as used in this Lease shall mean and refer to calendar days.

20.    **Limitation on Liability.** Any obligation or liability whatsoever of Landlord which may arise at any time under this Lease or any obligation or liability which may be incurred by it pursuant to any other instrument, transaction, or undertaking contemplated hereby shall not be personally binding upon, nor shall the enforcement thereof be against the property of, its trustees, directors, shareholders, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort, or otherwise. Any liability of Landlord under this Lease shall be limited solely to its interest in the Premises, and in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord. For purposes of determining the value of Landlord's interest in the Premises, the Project shall be deemed to be encumbered by a loan in an amount equal to the greater of the actual encumbrance amount or seventy percent (70%) of the fair market value of the Project, as determined as of the date Tenant's claim arises.

21.    **Time of Essence.** Time is of the essence with respect to the performance of Tenant's and Landlord's obligations under this Lease.

22.    **Entire Agreement.** This Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof. No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements, promises, negotiations, or representations are superseded by this Lease. This Lease may not be amended except by an instrument in writing signed by both parties hereto.

23.    **Notice.** All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by certified or registered mail or U.S. Postal Service Express Mail or other nationally or regionally recognized overnight courier, with postage prepaid, and shall be deemed sufficiently given if served in a manner specified in this Section. The addresses noted adjacent to a party's signature on this Lease shall be that party's address for delivery or mailing of notices. Either party may by written notice to the other specify a different address for notice, except that upon Tenant's taking possession of the Premises, the Premises shall constitute Tenant's address for notice. A copy of all notices to Landlord shall be concurrently transmitted to such party or parties at such addresses as Landlord may from time to time hereafter designate in writing. Except where otherwise expressly provided to the contrary, notice shall be deemed given upon delivery. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.    **Waivers.** No waiver by Landlord of the breach of any term, covenant or condition hereof by Tenant or Event of Default, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Event of Default or Tenant breach of any other term, covenant or condition hereof. Landlord's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Landlord's consent to, or approval of,

INITIALS

any subsequent or similar act by Tenant, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent. The acceptance of Rent by Landlord shall not be a waiver of any Event of Default by Tenant. Any payment by Tenant may be accepted by Landlord on account of monies or damages due Landlord, notwithstanding any qualifying statements or conditions made by Tenant in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Landlord at or before the time of deposit of such payment. THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25.      **No Right To Holdover**. If Tenant retains possession of the Premises after the termination of the Lease Term, unless otherwise agreed in writing, such possession shall be subject to immediate termination by Landlord at any time, and all of the other terms and provisions of this Lease (excluding any expansion or renewal option or other similar right or option) shall be applicable during such holdover period, except that Tenant shall pay Landlord from time to time, upon demand, as Base Rent for the holdover period, an amount equal to one hundred fifty percent (150%) of the Base Rent in effect on the termination date, computed on a monthly basis for each month or part thereof during such holding over.  All other payments shall continue under the terms of this Lease. In addition, Tenant shall be liable for all damages incurred by Landlord as a result of such holding over.  No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided, and this Section shall not be construed as consent for Tenant to retain possession of the Premises.  For purposes of this Section, "**possession of the Premises**" shall continue until, among other things, Tenant has delivered all keys to the Premises to Landlord, Landlord has complete and total dominion and control over the Premises, and Tenant has completely fulfilled all obligations required of it upon termination of the Lease as set forth in this Lease, including, without limitation, those concerning the condition and repair of the Premises.

26.      **Cumulative Remedies**. No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

27.      **Covenants and Conditions; Construction of Agreement**. All provisions of this Lease to be observed or performed by Tenant are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

28.      **Binding Effect; Choice of Law**. This Lease shall be binding upon the parties, their personal representatives, successors and assigns and is governed by the laws of the State of California. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

29.      **Subordination; Attornment**.

A.      **Subordination**. This Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any first mortgage ("**Lender**"), now existing or hereafter created on or against the Project or the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof, without the necessity of any further instrument or act on the part of Tenant. Tenant agrees, at the election of the Lender, to attorn to any such holder. Tenant agrees upon demand to execute, acknowledge and deliver such instruments, confirming such subordination and such instruments of attornment as shall be requested by any such Lender.  Notwithstanding the foregoing, any such Lender may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution, delivery or recording and in that event such Lender shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such Lender and had been assigned to such Lender.  The term "**mortgage**" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "**Lender**" of a mortgage shall be deemed to include the beneficiary under a deed of trust.

B.      **Attornment**. In the event that Landlord transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a mortgage to which this Lease is subordinated (i) Tenant shall, subject to the non-disturbance provisions hereof, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease shall automatically become a new lease between Tenant and such new owner, and (ii) Landlord shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Landlord's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior Landlord or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Tenant might have against any prior landlord, (c) be bound by prepayment of more than one month's rent, (d) be liable for the return of any security deposit paid to any prior Landlord which was not paid or credited to such new owner, or (e) be bound by any amendment or modification to this Lease not executed by such new owner, if such new owner previously had a lien secured by the Premises.

C.      **Self-Executing**. The agreements contained in this Section shall be effective without the execution of any further documents; provided, however, that, upon written request from Landlord or a Lender in connection with a sale, financing or refinancing of the Premises, Tenant and Landlord shall execute such further writings as may be reasonably required, in a form required by Lender, to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

30.      **Attorneys' Fees**. In the event either party hereto initiates litigation to enforce the terms and provisions of this Lease, the non-prevailing party in such action shall reimburse the Prevailing Party for its reasonable attorney's fees, filing fees, and court costs. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "**Prevailing Party**" shall include, without limitation, a party who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other party of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Landlord shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Event of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Event of Default or resulting breach ($200 is a reasonable minimum per occurrence for such services and consultation).

31.      **Landlord's Access; Showing Premises; Repairs; Solar**. Landlord and Landlord's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Landlord may deem necessary or desirable and the erecting, using and maintaining of, among other things desired by Landlord, utilities, services, security systems, communication systems, fire sprinklers or detection systems, solar power systems, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect on Tenant's use of the Premises.  All such activities shall be without abatement of rent or liability to Tenant.  Without limiting the generality of the foregoing, Tenant agrees and understands that Landlord shall have the right (provided that the exercise of Landlord's rights does not adversely affect Tenant's use and occupancy of the Premises or subject Tenant to additional costs), without Tenant's consent, to place a solar electric generating system, a satellite system and/or other system and/or equipment on the roof of the Building (together with appurtenances within the Premises as reasonably required) or enter into a lease(s) for the roof of the Building whereby such roof Tenant(s) shall have the right to install any such systems on the roof of the Building, and Landlord and its agents shall have access to the Premises and roof to accomplish the foregoing.

32.      **Signs; Press Releases**. Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners, or painting, or erect or install any signs, windows or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. Upon surrender or vacation of the Premises, Tenant shall have removed all signs and repair, paint, and/or replace the building facia surface to which its signs are attached.  Tenant shall obtain all applicable governmental permits and approvals for sign and exterior treatments.  All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's approval and conform in all respects to Landlord's requirements. Landlord may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof.  Landlord may erect a suitable sign on the Premises stating the Premises are available to let or that the Project is available for sale.  Except for ordinary "For Sublease" signs which may be placed only on the Premises, Tenant shall not place any sign upon the Project without Landlord's prior written consent.  All signs must comply with all Legal Requirements. Landlord shall have the right to publicize Landlord and Tenant's relationship regarding this Lease.

33.      **Termination; Merger**. Unless specifically stated otherwise in writing by Landlord, the voluntary or other surrender of this Lease by Tenant, the mutual termination or cancellation hereof, or a termination hereof by Landlord for breach by Tenant, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Landlord may elect to continue any one or all existing subtenancies. Landlord's failure within 10

INITIALS

DocuSign Envelope ID: C7221CA93-8350-4A81-9096-4DF78FD92737
DocuSign Envelope ID: BD7274FC-D336-47C1-BBF8-...

days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Landlord's election to have such event constitute the termination of such interest.

34.    **Consents.** Except as otherwise provided herein, wherever in this Lease the consent of a party is required for an act by or for the other party, such consent shall not be unreasonably withheld or delayed. Landlord's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Tenant for any Landlord consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Material or a so-called "landlord-lender" agreement, shall be paid by Tenant upon receipt of an invoice and supporting documentation therefor. The failure to specify herein any particular condition to Landlord's consent shall not preclude the imposition by Landlord at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given.

35.    **Guarantor.**

A.    **Execution.** The Guarantors, if any, shall each execute Landlord's standard guaranty form.

B.    **Event of Default.** It shall constitute an Event of Default of the Tenant if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

36.    **Quiet Possession.** If Tenant shall perform all of the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the Lease Term, have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord.

37.    **Security Measures.** Tenant hereby acknowledges that Landlord shall have no obligation whatsoever to provide guard service or other security measures. Tenant assumes all responsibility for the protection of the Premises, Tenant, its agents and invitees and their property from the acts of third parties. Tenant acknowledges and agrees that, if Landlord patrols the Project, Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

38.    **Reservations.** Landlord reserves the right: (i) to grant, without the consent or joinder of Tenant, such easements, rights and dedications that Landlord deems necessary, (ii) to cause the recordation of parcel maps and restrictions, and (iii) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Tenant. Tenant agrees to sign any documents reasonably requested by Landlord to effectuate such rights.

39.    **Authority; Multiple Parties; Execution.**

A.    If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

B.    If and when included within the term "**Tenant,**" as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant. Additionally, if there be more than one Tenant, then each Tenant hereunder agrees that (i) the act of any one Tenant, acting alone, shall be sufficient to bind all Tenants with respect to their respective rights and obligations under this Lease and (ii) Landlord shall have the unconditional right to rely upon the act of any one Tenant as being binding upon all Tenant's without any obligation to inquire as to the authority of the Tenant with whom Landlord is dealing.

C.    This Lease may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Lease. Execution copies of this Lease may be delivered by facsimile or email, and the parties hereto agree to accept and be bound by facsimile signatures or scanned signatures transmitted via email hereto, which signatures shall be considered as original signatures with the transmitted Lease having the same binding effect as an original signature on an original Lease. At the request of either party, any facsimile document or scanned document transmitted via email is to be re-executed in original form by the party who executed the original facsimile document or scanned document. Neither party may raise the use of a facsimile machine or scanned document or the fact that any signature was transmitted through the use of a facsimile machine or email as a defense to the enforcement of this Lease.

40.    **Conflict.** Any conflict between the Basic Lease Provisions of this Lease and the other Sections of this standard base Lease, the Basic Lease Provisions shall control. All exhibits and addenda attached hereto are hereby incorporated into this Lease and made a part hereof. In the event of any conflict between such exhibits or addenda and the other terms of the standard base Lease, such exhibits or addenda shall control.

41.    **Offer.** This Lease is not intended to be binding until executed and delivered by all Parties hereto. The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties.

42.    **Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification.  As long as they do not materially change Tenant's obligations hereunder, Tenant agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

43.    **Waiver of Jury Trial. THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.**

44.    **Accessibility; Americans with Disabilities Act.**

A.    **CASp Statement.**  Landlord makes the following statement based on Landlord's actual knowledge in order to comply with California Civil Code Section 1938: The Building and Premises have not undergone an inspection by a Certified Access Specialist (CASp).

B.    **No Representation or Warranty.**  Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Tenant's specific use of the Premises, Landlord makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Tenant's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Tenant agrees to make any such necessary modifications and/or additions at Tenant's expense.

C.    **California Law Disclosure.**  A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.

D.    **Acknowledgement.** Landlord and Tenant hereby mutually agree that in the event a CASp inspection is requested by Tenant, the fee for the CASp inspection and the cost of making any repairs necessary to correct violations of construction-related accessibility standards noted in the CASp inspection shall be paid by Tenant.

45.    **REIT Provisions.**  Tenant understands that, in order for an indirect owner of Landlord to qualify as a REIT, the following requirements (the "**REIT Requirements**") must be satisfied:

A.    **Subleasing.** Anything contained in this Lease to the contrary notwithstanding, Tenant shall not sublet the Premises on any basis such that the rent or other amounts to be paid by the sublessee thereunder would be based, in whole or in part, on either (i) the net income or profits derived by the business activities of the proposed sublessee, or (ii) any other formula such that any portion of the Rent would fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Internal Revenue Code, or any similar or successor provision hereto.

B.    **Personal Property Limitation.** Anything contained in the Lease to the contrary notwithstanding, the average of the fair market values of the items of personal property that are leased to Tenant under the Lease at the beginning and at the end of any year shall not exceed fifteen percent (15%) of the average of the aggregate fair market values of the leased property at the beginning and at the end of such year (the "**Personal Property**

Page **12** of **17**

INITIALS

DocuSign Envelope ID: C7271FA93-83FP-4A91-8096-4DF78FD92537
DocuSign Envelope ID: BD7274FC-D336-47C1-BBF...

Limitation"). If Landlord reasonably anticipates that the Personal Property Limitation will be exceeded with respect to the leased property for any year, Landlord shall notify Tenant, and Tenant either (i) shall purchase at fair market value any personal property anticipated to be in excess of the Personal Property Limitation ("Excess Personal Property") either from Landlord or a third party or (ii) shall lease the Excess Personal Property from a third party. In either case, Tenant's Base Rent obligation shall be equitably adjusted. Notwithstanding anything to the contrary set forth above, Tenant shall not be responsible in any way for determining whether Tenant has exceeded or will exceed the Personal Property Limitation and shall not be liable to Landlord or any of its shareholders in the event that the Personal Property Limitation is exceeded, as long as Tenant meets its obligation to acquire or lease any Excess Personal Property as provided above. This section is intended to ensure that the Rent qualifies as "rents from real property," within the meaning of Section 856(d) of the Internal Revenue Code, or any similar or successor provisions thereto, and shall be interpreted in a manner consistent with such intent.

C. REIT Requirements. Tenant agrees, and agrees to use its reasonable efforts to cause its affiliates, to cooperate in good faith with Landlord to ensure that the terms of this Section are satisfied. Tenant agrees, and agrees to use reasonable efforts to cause its affiliates, upon request by Landlord to take reasonable action necessary to ensure compliance with all REIT Requirements. If Tenant becomes aware that the REIT Requirements are not, or will not be, satisfied, Tenant shall notify, or use reasonable efforts to cause its affiliates to notify Landlord of such noncompliance. Notwithstanding anything herein to the contrary, in the event that Tenant defaults in its obligations under this Section with respect to the REIT Requirements and fails to cure the same within thirty thirty days after written notice from Landlord, then Landlord's sole remedy for Tenant's breach of its obligations under this Section shall be to terminate the Lease (provided, however, that the preceding shall not limit Landlord's right to pursue all other available remedies in connection with an Event of Default by Tenant of any other obligations or provisions under the Lease other than those set forth in this Section).

46. Interpretation. This Lease shall be deemed to have been drafted by both parties and shall not be interpreted against any person as drafter. In addition, prior drafts of this Lease or any letters of intent regarding the same shall not be used in any way to interpret the provisions hereof.

47. Force Majeure. Landlord shall not be held responsible for delays in the performance of its obligations hereunder when caused by strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or other casualty, and other causes beyond the reasonable control of Landlord ("Force Majeure").

48. Arbitration.

A. Subject to (B) below, in the event of any dispute or disagreement between the parties as to the validity, construction, enforceability or performance of this Lease which cannot be resolved by the mutual agreement of the parties, and mindful of the high cost of litigation, not only in dollars but time and energy as well, the parties intend to and do hereby establish a quick, final and binding out-of-court dispute resolution procedure to be followed in the unlikely event any controversy should arise out of or concerning the performance of this Lease. Accordingly, the parties do hereby covenant and agree as follows:

(1) Any controversy, dispute, or claim of whatever nature arising out of, in connection with, or in relation to the interpretation, performance or breach of this Lease, including any claim based on contract, tort, or statute, shall be determined, at the request of any party to this Lease by binding arbitration before a retired judge of the applicable court of jurisdiction affiliated with Judicial Arbitration & Mediation Services, Inc. ("J.A.M.S.") conducted at a location determined by an arbitrator in the County of Los Angeles, State of California administered by and in accordance with the then existing Rules of Practice and Procedure of Judicial Arbitration & Mediation Services (J.A.M.S.), and judgment upon any award rendered by the arbitrator(s) may be entered by any state or federal Court having jurisdiction thereof.

(2) The provisions of California Code of Civil Procedures Section 1283.05 or its successor section(s) are incorporated in and made a part of this Lease. Depositions may be taken and discovery may be obtained in any arbitration under this Lease in accordance with such section(s).

(3) The arbitrator shall determine which is the prevailing party and may include in the award that party's costs and reasonable attorneys' fees.

(4) As soon as practicable after selection of the arbitrator, the arbitrator or such arbitrator's designated representative shall determine a reasonable estimate of anticipated fees and costs of the arbitrator, and render a statement to each party setting forth that party's pro rata share of such fees and costs. Thereafter each party shall, within ten days of receipt of such statement, deposit such sum with the arbitrator. Failure of any party to make such a deposit shall not otherwise serve to abate, stay or suspend the arbitration proceedings.

B. Any party shall have the right to apply for and obtain a temporary restraining order or other temporary or permanent injunctive or equitable relief from a court of competent jurisdiction to enforce the provisions hereof or to otherwise protect its rights under this Section. Notwithstanding the foregoing, the following claims, disputes or disagreements under this Lease are expressly excluded from the arbitration procedures set forth herein: (i) disputes for which a different resolution determination is specifically set forth in this Lease; (ii) all claims by either party which (1) seek anything other than enforcement or determination of rights under this Lease or (2) are primarily founded upon matters of fraud, willful misconduct, bad faith or any other allegations of tortious action, and seek the award of punitive or exemplary damages; (iii) claims relating to (1) Landlord's exercise of any unlawful detainer rights pursuant to applicable Legal Requirements or (2) rights or remedies used by Landlord to gain possession of the Premises or terminate Tenant's right of possession to the Premises, all of which disputes shall be resolved by suit filed in the applicable court of jurisdiction, the decision of which court shall be subject to appeal pursuant to applicable Legal Requirements; and (iv) any claim or dispute that is within the jurisdiction of Small Claims Court.

C. The provisions of this Section shall not limit, require the postponement of, or in any other way preclude the exercise of any right or remedies otherwise enjoyed by any party to this Lease under the provisions hereof.

49. Miscellaneous.

A. Neither this Lease nor a memorandum of lease shall be filed by or on behalf of Tenant in any public record. Landlord may prepare and file, and upon request by Landlord Tenant will execute, a memorandum of lease.

B. Upon receipt of written request from Landlord, Tenant, at Tenant's sole cost and expense, shall deliver to Landlord data regarding the electricity consumed in the operation of the Premises (the "Energy Data") for purposes of regulatory compliance, manual and automated benchmarking, energy management, building environmental performance labeling and other related purposes, including but not limited, to the Environmental Protection Agency's Energy Star rating system and other energy benchmarking systems. Landlord shall use commercially reasonable efforts to utilize automated data transmittal services offered by utility companies to access the Energy Data. Landlord shall not publicly disclose Energy Data without Tenant's prior written consent. Landlord may, however, disclose Energy Data that has been modified, combined or aggregated in a manner such that the resulting data is not exclusively attributable to Tenant.

C. Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.

50. Asbestos Disclosure. LANDLORD HEREBY DISCLOSES TO TENANT THAT LANDLORD KNOWS OR HAS REASONABLE CAUSE TO BELIEVE THAT ASBESTOS-CONTAINING MATERIALS ARE PRESENT IN THE BUILDING AND THE PREMISES. TENANT ACKNOWLEDGES THAT LANDLORD HAS SATISFIED ITS OBLIGATION TO NOTIFY TENANT OF THE PRESENCE OF ASBESTOS-CONTAINING MATERIALS IN THE BUILDING PURSUANT TO CALIFORNIA HEALTH & SAFETY CODE SECTION 25359.7, AND TENANT SHALL NOT DISTURB ANY ASBESTOS-CONTAINING MATERIALS.

[SIGNATURE PAGE FOLLOWS]

Page 13 of 17



INITIALS

DocuSign Envelope ID: C731FA93-83E9-4821-9096-4DF78FD92737
DocuSign Envelope ID: BD7274FC-D336-47C1-BB5B-9ADBA4906BE5

The parties hereto have executed this Lease on the dates specified about their respective signatures.

**Landlord:**

REXFORD INDUSTRIAL REALTY, L.P.,
a Maryland limited partnership

By:  Rexford Industrial Realty, Inc.,
     a Maryland corporation,
     Its General Partner

By: _____

Printed: Howard Schwimmer

Title: Co-Chief Executive Officer

Date: Jun 26, 2018 | 11:58 AM PDT

Address: 11620 Wilshire Boulevard, Suite 1000
         Los Angeles, California 90025
Telephone: +1 (310) 966-1680

**With a Copy to:**

Attn: General Counsel
C/O: Rexford Industrial
Address: 11620 Wilshire Boulevard, Suite 1000
         Los Angeles, California 90025

**Tenant:**

F  A  SOLIMAN  MANAGEMENT  INC,  a  California
corporation, and REEFTON, LLC, a California limited
liability company, jointly and severally

By: _____

Printed: Fahd Soliman

Title: Owner

Date: 06/19/18

Address: 20701 Dumont St, Woodland Hills, CA 91364

Telephone: 818-458-3262

DocuSign Envelope ID: BC7274FC-D336-47C1-BBEB-2341A46C2EEB

Exhibit "A"

SITE PLAN

ATTACHED TO AND A PART OF THE LEASE AGREEMENT
DATED JUNE 13, 2018 BETWEEN
REXFORD INDUSTRIAL REALTY, L.P.,
A MARYLAND LIMITED PARTNERSHIP
and
P A SOLIMAN MANAGEMENT INC, A CALIFORNIA CORPORATION, AND
REEFTON, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, JOINTLY AND SEVERALLY



SUBJECT PREMISES

Not to scale. Does not constitute a representation or warranty regarding the Project or any portion thereof, and Landlord
reserves the right to modify any portion of the Project in its sole discretion as provided in the Lease.

DocuSign Envelope ID: BD7274FC-D336-47C1-BBEB-2341AA5C2EEB

EXHIBIT "B"

PROJECT RULES AND REGULATIONS

ATTACHED TO AND A PART OF THE LEASE AGREEMENT
DATED JUNE 13, 2018 BETWEEN
REXFORD INDUSTRIAL REALTY, L.P.,
A MARYLAND LIMITED PARTNERSHIP
and
F A SOLIMAN MANAGEMENT INC, A CALIFORNIA CORPORATION, AND
REEFTON, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, JOINTLY AND SEVERALLY

### Rules and Regulations

1. The sidewalk, entries, driveways and drive aisles of the Project shall not be obstructed by Tenant, or its agents, or used by them for any purpose other than ingress and egress to and from the Premises.

2. Tenant shall not place any objects, including antennas, outdoor furniture, etc., in the parking areas, landscaped areas or other areas outside of its Premises, or on the roof of the Project without Landlord's prior written consent.

3. Except for guide, signal, or seeing-eye dogs, no animals shall be allowed in the offices, halls, or corridors in the Project.

4. Tenant shall not disturb the occupants of the Project or adjoining buildings by the use of any radio or musical instrument or by the making of loud or improper noises.

5. If Tenant desires telegraphic, telephonic or other electric connections in the Premises, Landlord or its agent will direct the electrician as to where and how the wires may be introduced; and, without such direction, no boring or cutting of wires will be permitted. Any such installation or connection shall be made at Tenant's expense.

6. Tenant shall not install or operate any steam or gas engine or boiler, or other mechanical apparatus in the Premises, except as specifically approved in the Lease. The use of oil, gas or inflammable liquids for heating, lighting or any other purpose is expressly prohibited. Explosives or other articles deemed extra hazardous shall not be brought into the Project.

7. Parking any type of recreational vehicles is specifically prohibited on or about the Project. Further, parking any type of trucks, trailers or other vehicles in the Building is specifically prohibited. In the event that a vehicle is disabled, it shall be removed within 48 hours. There shall be no "For Sale" or other advertising signs on or about any parked vehicle. All vehicles shall be parked in the designated parking areas in conformity with all signs and other markings. All parking will be open parking, and no reserved parking, numbering or lettering of individual spaces will be permitted except as specified by Landlord or in the Lease.

8. Tenant shall maintain the Premises free from rodents, insects and other pests.

9. Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of the Rules and Regulations of the Project.

10. Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Landlord shall not be responsible to Tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of Tenant by the janitors or any other service employee or person.

11. Tenant shall give Landlord prompt notice of any defects in the water, lawn sprinkler, sewage, gas pipes, electrical lights and fixtures, heating apparatus, or any other service equipment affecting the Premises.

12. Tenant shall not permit storage outside the Premises, or dumping of waste or refuse or permit any harmful materials to be placed in any drainage system or sanitary system in or about the Premises.

13. All moveable trash receptacles provided by the trash disposal firm for the Premises must be kept in the trash enclosure Areas, if any, provided for that purpose.

14. No auction, public or private, will be permitted on the Premises or the Project.

15. No awnings shall be placed over the windows in the Premises except with the prior written consent of Landlord.

16. The Premises shall not be used for lodging, sleeping or cooking or for any immoral or illegal purposes or for any purpose other than that specified in the Lease. No gaming devices shall be operated in the Premises.

17. Tenant shall ascertain from Landlord the maximum amount of electrical current which can safely be used in the Premises, taking into account the capacity of the electrical wiring in the Project and the Premises and the needs of other tenants, and shall not use more than such safe capacity. Landlord's consent to the installation of electric equipment shall not relieve Tenant from the obligation not to use more electricity than such safe capacity.

18. Tenant assumes full responsibility for protecting the Premises from theft, robbery and pilferage.

19. Tenant shall not install or operate on the Premises any machinery or mechanical devices of a nature not directly related to Tenant's ordinary use of the Premises and shall keep all such machinery free of vibration, noise and air waves which may be transmitted beyond the Premises.

20. Tenant shall not permit smoking in the office areas of the Premises.

21. Tenant shall not conduct any loading or unloading of materials or supplies outside of the areas specifically designated by Landlord for such activities.

14

EXHIBIT "C"

FORM OF TENANT CONTACT INFORMATION SHEET



**Rexford Industrial**

## Tenant Contact Information

Please complete and return this form immediately to:

Rexford Industrial Realty, L.P.          Tel (310) 966-1680
11620 Wilshire Boulevard, Suite 1000     E-Fax (310) 405-7646
Los Angeles, California 90025

### Tenant Contact Information

1. Tenant Full Legal Name: FAHD ABDELRAHMAN SOLIMAN
   Office Main: (          )                    Mobile: ( 81 8   ) 45 83 62
   Email Address: FAHD@MEW1.NET
   Emergency Contact: MAYRA MENDOZA    Emergency Phone Number ( 323  ) 4456179
2. Leased Premises Address: 18310 & 18316 OXNARD ST
3. On-Site Contact Name/Title: MAYRA MENDOZA/ OFFICE MANAGER
   Office Main: (          )                    Mobile: ( 32 3   ) 44561 7 9
   Email Address: MAYRA@MEW1.NET
4. Accounts Payable Contact Name: MAYRA MENDOZA
   Office Main: (          )                    Mobile: ( 323445-6179  )
   Email Address: MAYRA@MEW1.NET
   Mailing Address (if different):

### Tenant Business Information

5. Nature of Business: Pharmacy    NAICS (6-digit) Code for Business: 446110
6. Total Number of Employees at this location: 6
7. Product or Service is Used by (Consumers) or by Other Businesses (circle one)
8. Is any portion of your business involved in producing or selling goods or services via the Internet or Amazon/ eBay/ Craigslist? Yes or (No) (circle one)
   If yes, approximately what percent is sold to consumers 100%
   If yes, approximately what percent is sold to businesses
9. Is any portion of your business involved in manufacturing/warehousing any products/services that are eventually sold via the Internet? (Yes) or No (circle one)
   If yes, approximately what percent
10. What percentage of your business do you expect to experience sales growth due to the Internet/e-commerce over the next 1-2 years 40%
11. Where does the Product/Service Originate From? OnSite / US manufactures
12. Percent of Product or Service that is Sourced in CA
13. Percent of Product or Service that is Sourced in USA but outside CA
14. Percent of Product or Service that is Imported from outside USA
15. Where is the Product/Service distributed to? California /neighboring States
16. Percent of Product or Service that is distributed to or consumed in CA 90-95 %
17. Percent of Product or Service that is distributed to or consumed in USA, but outside of CA 5%
18. Percent of Product or Service that is exported to outside of USA 0 %

Signature:                              Date: 06/19/18

DocuSign Envelope ID: BD7274FC-0336-47C1-8BEB-2341AA5C2EEB

**Rexford Industrial**

## TENANT MOVE-IN/MOVE-OUT CHECKLIST

ENTITY NAME:
TENANT NAME:
PREMISES ADDRESS:
POSSESSION DATE:
MOVE-OUT DATE:

*Unless otherwise noted, the premises are clean, in good working order and undamaged. Occupant accepts the Premises as-is with the exceptions listed below. This inspection form is made a part of and is subject to the terms and conditions of the Commercial Lease for the above referenced Premises.*

| OFFICE AREAS | MOVE-IN CONDITION | MOVE-OUT CONDITION |
|---|---|---|
| CARPET | | |
| FLOORING | | |
| CEILING | | |
| DOORS | | |
| HVAC | | |
| LIGHTS | | |
| WALLS | | |
| WINDOW COVERINGS | | |
| KITCHEN AREA | | |

| RESTROOMS | MOVE-IN CONDITION | MOVE-OUT CONDITION |
|---|---|---|
| FLOORING | | |
| CEILING | | |
| DOORS | | |
| LIGHTS | | |
| WALLS | | |
| FIXTURES | | |
| MIRRORS | | |
| PLUMBING | | |
| FANS | | |

| WAREHOUSE | MOVE-IN CONDITION | MOVE-OUT CONDITION |
|---|---|---|
| FLOORING | | |
| CEILING | | |
| MAN DOORS | | |
| LOADING DOORS | | |
| LIGHTS | | |
| WALLS | | |
| SKYLIGHTS | | |
| COLUMNS | | |
| DOCK EQUIPMENT | | |
| FIRE SPRINKLERS | | |
| ELEC PANEL/DISTRIBUTION | | |

| SINGLE TENANT BUILDING | MOVE-IN CONDITION | MOVE-OUT CONDITION |
|---|---|---|
| LANDSCAPE | | |
| PAVING / YARD AREA | | |
| EXTERIOR MISC | | |

| ADDITIONAL COMMENTS | MOVE-IN CONDITION | MOVE-OUT CONDITION |
|---|---|---|
| | | |

*The "Move-In Condition" portion of this form is to be completed at the time of initial possession of the Premises. Receipt of a copy of this inspection form is hereby acknowledged.*

TENANT SIGNATURE:
DATE:
LANDLORD SIGNATURE:
DATE:

*The "Move-Out Condition" portion of this form is to be completed at the time of Tenant move-out of the Premises. Receipt of a copy of this inspection form is hereby acknowledged.*

TENANT SIGNATURE:
DATE:
LANDLORD SIGNATURE:
DATE:

MATTHEW ABBASI, ESQ.; SBN 215030
**ABBASI LAW CORPORATION**
8889 WEST OLYMPIC BLVD, SUITE 240
BEVERLY HILLS, CALIFORNIA 90211
TEL:(310) 358-9341
E-FAX: (888) 709-5448
EMAIL: MATTHEW@MALAWGROUP.COM

PROPOSED ATTORNEYS FOR, DEBTOR,
REEFTON, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

IN RE:

REEFTON, LLC

DEBTOR.

**CASE NO.: 2:20-bk-10181-VZ**

**CHAPTER 11 PROCEEDING**

**PROOF OF SERVICE**

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: **8889 West Olympic Boulevard, Suite 240, Beverly Hills, CA 90211**. A true and correct copy of the foregoing document entitled **DEBTOR'S OPPOSITION TO REXFORD INDUSTRIAL REALTY, L.P.'S MOTION FOR RELIEF OF STAY UNDER 11 U.S.C. §362 (REAL PROPERTY); DECLARATION OF FAHD SOLIMAN IN SUPPORT OF OPPOSITION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **1/28/2020**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

*Kelly L Morrison on behalf of U.S. Trustee United States Trustee (LA)*
*kelly.l.morrison@usdoj.gov*

*Lane M Nussbaum on behalf of Interested Party Rexford Industrial Realty, L.P. (Tarzana)*
*lnussbaum@nussbaumapc.com, info@nussbaumapc.com*

*United States Trustee (LA)*
*ustpregion16.la.ecf@usdoj.gov*

**2.  SERVED BY UNITED STATES MAIL**: On **1/28/2020** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**BANKRUPTCY COURT (PERSONAL DELIVERY COURTHOUSE)**
Honorable Hon. Vincent P. Zurzolo
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1360 / Courtroom 1368
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 1/28/2020 | **Matthew Abbasi** | */S/MATTHEW ABBASI* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

1 MATTHEW ABBASI, ESQ.; SBN 215030
  **ABBASI LAW CORPORATION**
2 8889 WEST OLYMPIC BLVD, SUITE 240
  BEVERLY HILLS, CALIFORNIA 90211
3 TEL:(310) 358-9341
  E-FAX: (888) 709-5448
4 EMAIL: MATTHEW@MALAWGROUP.COM

5 PROPOSED ATTORNEYS FOR, DEBTOR,
  REEFTON, LLC

6

7

8

9      **UNITED STATES BANKRUPTCY COURT**

10      **CENTRAL DISTRICT OF CALIFORNIA**

11       **LOS ANGELES DIVISION**

12

13

14

15  IN RE:         **CASE NO.: 2:20-bk-10181-VZ**

16

17  REEFTON, LLC      **CHAPTER 11 PROCEEDING**

              **PROOF OF SERVICE**

18     DEBTOR.

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: **8889 West Olympic Boulevard, Suite 240, Beverly Hills, CA 90211**. A true and correct copy of the foregoing document entitled **DEBTOR'S OPPOSITION TO REXFORD INDUSTRIAL REALTY, L.P.'S MOTION FOR RELIEF OF STAY UNDER 11 U.S.C. §362 (REAL PROPERTY); DECLARATION OF FAHD SOLIMAN IN SUPPORT OF OPPOSITION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **1/28/2020**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

*Kelly L Morrison on behalf of U.S. Trustee United States Trustee (LA)*
*kelly.l.morrison@usdoj.gov*

*Lane M Nussbaum on behalf of Interested Party Rexford Industrial Realty, L.P. (Tarzana)*
*lnussbaum@nussbaumapc.com, info@nussbaumapc.com*

*United States Trustee (LA)*
*ustpregion16.la.ecf@usdoj.gov*

**2. SERVED BY UNITED STATES MAIL**: On **1/28/2020** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**BANKRUPTCY COURT (PERSONAL DELIVERY COURTHOUSE)**
Honorable Hon. Vincent P. Zurzolo
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1360 / Courtroom 1368
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 1/28/2020 | **Matthew Abbasi** | */S/MATTHEW ABBASI* |
|-----------|--------------------|---------------------|
| *Date* | *Printed Name* | *Signature* |